Filed 5/13/25  P. v. Nayeri CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059610 |
| v. | (Super. Ct. No. 13CF3394) |
| HOSSEIN NAYERI, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge. Affirmed. Appellant's Motion to Strike. Granted. Appellant's Motion to Augment. Denied.

James S. Thomson and Laura Ann Douglas for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Following his convictions for aggravated kidnapping and torture, Hossein Nayeri was sentenced to multiple life terms in prison. On appeal, he contends his trial was unfair because the prosecutor used his Islamic heritage to vilify him in front of the jury and engaged in numerous other forms of misconduct. He also asserts his own attorney was ineffective and that the trial court made a host of errors during the course of the proceedings. We affirm.

## STATEMENT OF FACTS

Nayeri immigrated to the United States from Iran in the early 1990's, when he was 13 years old. While attending high school in Fresno, he became friends with his future codefendants Kyle Handley and Ryan Kevorkian. Nayeri and Kevorkian both joined the Marines after finishing high school, but Nayeri had disciplinary problems and was eventually discharged for going absent without leave. He then went into the marijuana business, growing and selling cannabis to medical marijuana dispensaries in Northern California.

During this time, Nayeri also met his future wife, Cortney Shegerian, who turned out to be a key witness for the prosecution. At trial, she described Nayeri as smart and charming but said he could also be very manipulative, domineering, and abusive. In fact, one time during their marriage, Nayeri became so angry and aggressive toward her that she called the police and had him arrested for domestic abuse.

That was not Nayeri's only legal entanglement prior to this case. In 2005, he was charged with vehicular manslaughter for causing a fatal accident while driving under the influence of drugs and alcohol. The case was delayed several years because Nayeri fled to Iran, but after returning to the

2

United States in 2008, he was arrested, convicted, and placed on formal probation.

In 2010, Nayeri expanded his marijuana operation to Orange County, where he reconnected with his old friend Kyle Handley. Like Nayeri, Handley cultivated marijuana for medical marijuana dispensaries. They decided to go into business together, and in the fall of 2011, Handley stayed with Nayeri and Shegerian at their Newport Beach apartment for several months. By this time, Shegerian and Nayeri had been married for about a year, and Shegerian was attending law school. She recalled at trial that Nayeri and Handley were very close and spent a considerable amount of time together during this period.

As it turned out, one of Handley's buyers was Michael S., the primary victim in this case. As the co-owner of two medical marijuana dispensaries in Orange County, Michael purchased marijuana from Handley from time to time. He also considered Handley to be his friend and travelled with him to Las Vegas on multiple occasions. During those trips, Michael spent lavishly on food, lodging, and entertainment. And, per his usual custom, he paid for everything in cash.[1]

From all outward appearances, Handley seemed to enjoy spending time with Michael. But following their last trip to Vegas in May 2012, Handley suddenly stopped communicating and doing business with him. Although Michael tried contacting him on several occasions, Handley never returned his calls or came by his dispensaries, as he had done in the

___

[1] Due to the federal prohibition on marijuana sales, credit card companies and banks were unwilling to do business with Michael's dispensaries. Consequently, he took in a lot of cash that he had nowhere to deposit.

3

past. Handley disappeared from Michael's life, both professionally and personally, for no apparent reason.

At the time, Michael did not give much thought to that development. His dispensaries were doing well, and he was happily renting a room in a house on the Balboa Peninsula in Newport Beach. He certainly did not foresee the dark events that transpired in his life on October 2, 2012, which was roughly five months from the last time he had seen or heard from Handley.

In the wee hours that morning, Michael was awakened by two masked men who were pointing a flashlight and a shotgun in his face. When he reached for the gun, the men beat and choked him, causing him to pass out momentarily. The men bound Michael's feet together and tied his hands behind his back with plastic zip ties. They also blindfolded him and taped his mouth shut. Then they hastily dragged him down the stairs by his feet and placed him in a hallway next to his roommate Mary B., who, like Michael, was awakened at gunpoint, tied up, gagged and blindfolded by the intruders. Unlike Michael, however, Mary was not harmed in any other way. To the contrary, the men assured her that she would be alright if she kept quiet and did not resist.

Mary noticed the men spoke with a fake Spanish accent, as if they were trying to disguise their voices. She surmised there were three intruders in all because while one of them stood guard over her and Michael in the hallway, she heard two others rummaging around upstairs. After about 10 minutes, those two returned downstairs and asked Michael, "Where's the money?" He said he had $2,000 in his room, but the men said that was not enough; they wanted him to come up with a million dollars.

When Michael said he did not have that much money, they carried him and Mary to a van outside and drove them out to the Mojave Desert.

Along the way, Michael was subjected to horrific abuse. His captors believed he had buried a million dollars somewhere out in the desert, and in order to get him to tell them where it was, they repeatedly kicked him, beat him with a rubber hose, shocked him with a taser, and burned him with a blowtorch. Michael tried to explain to them that there was no million dollars, but every time he did so, they abused him some more.

At one point during the ordeal, Michael's blindfold slipped down momentarily, and he noticed the windows in the van were lined with panda paper, a two-toned plastic film that is commonly used by marijuana growers. Michael offered to give the men $100,000 that he had in a safe deposit box, and $20,000 more that he had at one of his dispensaries, but they were not interested in those proposals.

As promised, the men did not harm Mary. But she was situated so close to Michael in the back of the van that when his legs twitched from being tasered, they would sometimes come into contact with her. The men beat and belittled Michael whenever that happened. Even though his leg movements were involuntary, they used every excuse they could find to abuse him. All told, the beating, burning, and tasering went on for about two and a half hours before the van finally pulled over on a deserted road out near Rosamond.

Michael and Mary were still tied up and blindfolded when the men carried them out of the van and put them down on the desert sand. The men berated Michael, calling him a "puta" and an "ungrateful white boy." They also told him they were going to shoot him in the head for not coming up with the money, however, no shooting occurred. Instead, after talking on

his phone, one the men told Michael, "My patron says if I can't bring him the million dollars, then he wants me to bring him your dick."

The men proceeded to hold Michael down, lower his shorts and put a zip tie around the base of his penis. Then one of them took out a knife and began cutting off his penis. As he was doing so, the man chimed out the words "back and forth, back and forth" in a sing-song manner, as if he thought Michael's suffering was a joke. When he finished the deed, he doused Michael with bleach with the help of his companions. Then he turned to Mary and told her that he was going to toss his knife into the nearby bushes. He said if she could find the knife and cut herself free, it would be her "lucky day." He then tossed the knife and left with his two cohorts in the van.

Mary managed to hitch up her blindfold and retrieve the knife, just as the morning sun was beginning to appear on the horizon. She then walked about a mile to the main road and flagged down a patrol officer from the Kern County Sheriff's Department who happened to be in the area. Mary directed the officer back to where Michael was located, and when they arrived there, Michael was lying in the dirt, writhing in pain. Although he survived the ordeal, he suffered burns and bruises all over his body. And despite a thorough search of the area, his severed penis was never found.

During the ensuing investigation, Michael told police he had no known enemies and could not think of anyone who would want to harm him. But when the police canvassed Michael's neighborhood in search of clues, they got a break. It turned out that on the afternoon of the kidnapping, one of Michael's neighbors, Teresa T., saw a white pickup truck in the alley near Michael's house. Looking out her bedroom window, she saw three dark-skinned men near the truck, one of whom was wearing a hard hat. The men put an extension ladder up against Michael's house and raised and lowered it

several times, but they did not go up the ladder or appear to be doing any construction work in the area. Thinking this suspicious, Teresa jotted down the truck's license number. She then saw one of the men get in the truck and drive away, leaving the other two men behind.

A records check on the license plate number revealed the truck was registered to Handley, who was living in Fountain Valley at the time. When the police searched his home, they found a bleach-stained shirt, panda paper, and zip ties resembling those used in the kidnapping. They also noticed a strong smell of bleach coming from Handley's truck and found a blue nitrile glove in the passenger compartment of the vehicle. The glove contained DNA from Nayeri, and DNA belonging to Ryan Kevorkian (Nayeri's old high school buddy) was found on one of the zip ties.

Investigators subsequently discovered that Kevorkian's ex-wife Naomi Rhodus had worked with Nayeri and Handley in their marijuana business. In the months leading up to the kidnapping, she enlisted a co-worker to create a phony email account that was used to purchase tracking and surveillance equipment that was sent to Handley's home. Rhodus also rented the van and purchased the various firearms that were used in the kidnapping.

After learning Handley had been arrested and charged with kidnapping, Nayeri bought a one-way ticket to Iran and fled the country. Shegerian aided him the first few months he was abroad, by sending him money and lying to the police. However, she eventually came clean and told investigators everything she knew. She also worked with law enforcement to lure Nayeri out of Iran to Europe so he could be extradited back to the United States for trial.

Nayeri, Handley, Kevorkian, and Rhodus were jointly charged with two counts of aggravated kidnapping, and one count each of aggravated mayhem and torture. (Pen. Code, §§ 209, subd. (a), 205, 206.)[2] It was also alleged that they inflicted great bodily injury on Michael while torturing him. (§ 12022.7.) Before trial, Nayeri escaped from the Orange County jail for about a week, but he was apprehended in Northern California and ultimately tried separately from his codefendants.

At trial, Shegerian testified under a grant of immunity. She said that Nayeri and Handley remained close after Handley moved out of their apartment in early 2012. Around this time, Nayeri began conducting intense surveillance activities on Michael. Using high-tech cameras and sophisticated GPS equipment, Nayeri monitored Michael's car, home and businesses, as well as his parents and his girlfriend. Nayeri also had Shegerian research Michael on the internet and talked to her about how to go about poisoning his parents' dog.

In September 2012, just weeks before the kidnapping, Nayeri was monitoring Michael at home on his computer while Michael was out in the desert exploring a potential mining investment near Rosamond, which is where the kidnappers eventually took him and Mary. Nayeri asked Shegerian why anyone would want to be out in such a remote area. He then suggested to her that the desert would be a great place to bury cash.

A few days later, Shegerian saw Nayeri and Handley playing around with a blowtorch in her and Nayeri's garage. She also noticed masks, a hard hat, and a "fake construction worker outfit." Nayeri was scuffing up

---

[2] Unless noted otherwise, all further statutory references are to the Penal Code.

the hard hat on the ground to make it look worn. Although Shegerian suspected he was planning something nefarious, she did not feel like she was in a position to question him about his intentions. She never asked Nayeri what he was up to, nor did she object when he took a small taser that she usually kept on her keychain for purposes of self-defense.

Shegerian also went along with Nayeri when he asked her to buy four disposable "burner" phones around this time. Nayeri had her keep one of the phones, he gave one to Handley, and he kept one for himself. When Handley had trouble activating his phone, Nayeri had Shegerian explain to him how to do it. Shegerian did not know what happened to the fourth phone, but at trial the prosecution theorized that Nayeri ended up giving it to Kevorkian so they could all communicate with one another during the course of the kidnapping.

On September 26, 2012, less than a week before the kidnapping, Nayeri was driving his Chevy Tahoe in Newport Beach when a police officer tried to pull him over for speeding. Instead of yielding to the officer, Nayeri led him on a high-speed chase before ditching the Tahoe on Balboa Island and getting away on foot. The next day, Nayeri had Shegerian call the police and report the Tahoe had been stolen. By then, the police had found the abandoned vehicle and impounded it for safekeeping. They would later discover through a judicially authorized search that the Tahoe contained a slew of surveillance equipment that had been used to track Michael before he was kidnapped.

According to Shegerian, on the night of the kidnapping, Nayeri told her to use his iPhone at their apartment, in an apparent attempt to create an alibi. She did not hear from him again until eight o'clock the following morning. Calling on his burner phone, he instructed Shegerian to

put money in a meter where Handley's truck was parked on the Balboa Peninsula. Shegerian did as told. At Nayeri's behest, she also bought four more burner phones and agreed to meet him in the parking lot of a fast food restaurant later that day. Nayeri showed up for the meeting in Handley's truck. Upon giving Nayeri the phones, Shegerian noticed his hands were swollen and bruised, as if he had been in a fight. And when Shegerian got home that evening, she noticed there was a bloody sock amongst some trash that her dog had gotten into.

During the next few days, Nayeri tried to contact Handley several times, not knowing he had been arrested. When Nayeri discovered the authorities had searched Handley's house and taken him into custody, he directed Shegerian to attend Handley's arraignment so they could find out what he was being charged with. When Shegerian informed Nayeri that Handley was facing allegations of kidnapping, torture, and mayhem, he became frantic and paranoid. Instead of staying at home with Shegerian, he slept at a different motel every night for about a week. He also destroyed all of his phones, computers, and surveillance equipment before eventually fleeing to Iran.

In closing argument, the prosecutor theorized Nayeri masterminded the kidnapping scheme and enlisted Kevorkian and Handley to help him carry it out. Even though there was no direct evidence that Nayeri participated in the charged crimes, the prosecutor argued Shegerian's testimony and the circumstantial evidence proved that Nayeri was guilty of the charges.

Defense counsel did not dispute the charged offenses had been committed. However, he insisted that Nayeri played no part in them. Counsel

maintained that Shegerian falsely implicated Nayeri to avoid going to jail herself and that Nayeri was completely innocent of any criminal wrongdoing.

In support of this theory, Nayeri took the stand in his own defense. While admitting he tracked Michael for several months before the kidnapping, he insisted that had nothing to do with any kidnapping plot. Rather, he tracked Michael because Michael owed Handley money, and Handley feared Michael might try to skip out on him.[3]

According to Nayeri, Handley paid him $1,000 per week for his surveillance efforts, but Handley never said anything to him about wanting to harm Michael. Thus, he was "shocked" to learn of Handley's arrest for kidnapping and torturing Michael. Nayeri testified he fled to Iran because he was afraid of being falsely implicated in those crimes. Asked how his DNA ended up on the glove that was found in Handley's truck, Nayeri claimed he was framed. He theorized the police got his DNA from his Chevy Tahoe while it was impounded. Then they planted it on the glove in retaliation for the high-speed chase he initiated when the police tried to pull him over the week before Michael was kidnapped.

The jury was not convinced. On August 15, 2019, following a week of deliberations, it convicted Nayeri of kidnapping and found true allegations that Michael suffered bodily harm and Mary was exposed to a substantial risk of death. It also convicted Nayeri of torture but found not true the allegation he personally inflicted great bodily injury on Michael during that crime. The jury was unable to reach a verdict on the mayhem

---

[3] Michael testified he did not owe Handley any money at the time of the kidnapping. In fact, Michael said he never did much business with Handley at all because Handley was a small-time dealer with few resources at his disposal.

count, which was based on the dismemberment of Michael's penis, and that count was eventually dismissed.

Following the verdict, the trial court denied Nayeri's request to release the jurors' personal contact information, as well as his motions for self-representation and a new trial. It then sentenced him to prison for consecutive terms of life without the possibility of parole on the kidnapping counts, plus a consecutive term of life with the possibility of parole on the torture count.[4] This appeal followed.

## DISCUSSION

Nayeri raises a multitude of issues for our consideration. In addition to accusing the prosecutor of committing numerous acts of misconduct, he alleges the trial court made several erroneous rulings throughout the trial. He also contends his attorney was ineffective in various respects and cumulative error compels reversal. We will address each of his contentions in turn.

## I.

### PROSECUTORIAL MISCONDUCT

Nayeri argues that his trial was fundamentally unfair due to a pervasive array of "prosecutorial misconduct." As respondent points out, it is usually more fitting to describe such claims in terms of "prosecutorial error" because they do not require a showing the prosecutor acted with ill will or for an improper motive. (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667.) But,

---

[4] Handley suffered a similar fate in his separate trial. We affirmed the judgment against him in *People v. Handley* (Mar. 25, 2021, G056608) [nonpub. opn.] and judicially notice the record in that case. (Evid. Code, § 452, subd. (d).) The charges against Kevorkian and Rhodus were resolved by way of plea agreements.

in this case, Nayeri contends the prosecutor intentionally engaged in a course of conduct that led the jury to convict him based on fear, prejudice and other improper considerations. Therefore, the "misconduct" label is fitting here. (See, e.g., *People v. Trinh* (2014) 59 Cal.4th 216, 247-249 [referring to the prosecutor's alleged intentional wrongdoing as "prosecutorial misconduct"].)

## A. General Principles

A prosecutor's primary responsibility is to ensure the defendant is afforded a fair trial. (*People v. Force* (2019) 39 Cal.App.5th 506, 508.) But that does not mean the state's attorney must try his or her case with ""Chesterfieldian politeness."" (*People v. Fosselman* (1983) 33 Cal.3d 572, 580.) To the contrary, the adversarial nature of criminal trials requires prosecutors to pursue their cause with vigor and zeal, which is why the law affords prosecutors considerable latitude when it comes to presenting their case to the jury. (*United States v. Gilbert* (1999) 198 F.3d 1293, 1303; *People v. Vasquez* (2006) 39 Cal.4th 47, 65; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.)

However, there are limits in that regard. While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." (*Berger v. United States* (1935) 295 U.S. 78, 88.) Forceful and aggressive tactics may be permitted in some circumstances, but a prosecutor's actions will not be countenanced if they involve "deceptive or reprehensible methods of persuasion" or they "'infect[ed] the trial with such unfairness as to make the conviction a denial of due process.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 444 (*Doolin*).)

## B. Forfeiture

To preserve a claim of prosecutorial misconduct, the defendant is generally required to register an objection in the trial court and request that

the jury be admonished to disregard the alleged impropriety. (*People v. Centeno, supra,* 60 Cal.4th at p. 674.) As it turns out, however, Nayeri did not object to the vast majority of improprieties he has assigned to the prosecutor on appeal, which raises the specter of forfeiture. (See *ibid*.) Indeed, respondent argues the forfeiture doctrine applies to bar Nayeri's challenge to any alleged improprieties that he failed to object to in the trial court.

Nayeri disagrees. He maintains his failure to object should be excused because in each instance of alleged misconduct, an objection would have been futile and/or an admonition would not have cured the alleged harm. (See *People v. Centeno, supra,* 60 Cal.4tht at p. 674.) Alternatively, Nayeri contends his attorney was ineffective for failing to object to the prosecutor's alleged misdeeds. (See *People v. Lopez* (2008) 42 Cal.4th 960, 966 ["A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel"].)

In light of Nayeri's ineffective assistance of counsel claim, we will address the merits of his prosecutorial misconduct arguments. (*People v. Ochoa* (1998) 19 Cal.4th 353, 427–428; *People v. Azcona* (2020) 58 Cal.App.5th 504, 515.) If a review of the merits reveals the conduct in question was not improper, our analysis will end there because in that situation, there could be no error or ineffective assistance of counsel. (See generally *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 48 [defense attorneys are not required to make meritless objections].)

If misconduct has been shown, we will proceed to the next step and determine whether defense counsel was ineffective for failing to object to it. Because the decision to object is generally considered a tactical decision, it will seldom establish ineffective assistance of counsel. (*Yarborough v. Gentry*

(2003) 540 U.S. 1, 6; *People v. Hayes* (1990) 52 Cal.3d 577, 621; *People v. Beasley* (2003) 105 Cal.App.4th 1078, 1092.) To prove otherwise, Nayeri must demonstrate his attorney's inaction fell below prevailing professional norms, and there is a reasonable probability he would have obtained a more favorable result at trial had an objection been registered. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

With these principles in mind, we now take up Nayeri's specific allegations of prosecutorial misconduct.

## C.  Nayeri's Iranian Heritage

During the trial, Nayeri testified he was born in Iran and immigrated to the United States as a teenager in the early 1990's. He also testified he returned to Iran after being charged with vehicular manslaughter in 2005 and then again in 2012, after Handley was arrested. So, by virtue of Nayeri's own testimony, the jury would have known he was of Iranian descent and had ties to Iran. However, Nayeri contends that, by a combination of subtle and not so subtle means, the prosecutor unfairly emphasized his Iranian ancestry and relied on a racialized narrative to portray him as an untrustworthy outsider and turn the jury against him.

### 1.  Referring to Iran by its Official Name

In its trial brief, and during discussions outside the jury's presence, the prosecutor always referred to Nayeri's native country by its commonly used name, Iran. But that was not the case when the prosecutor was in front of the jury. Although the prosecutor usually referred to Nayeri's homeland as Iran in the jury's presence, there were about half a dozen occasions where he referred to Iran by its official name, The Islamic Republic of Iran. Nayeri argues this was improper because Iran's official name is

15

synonymous with radical Islamic terrorism, and the prosecutor used it as part of a "contrived campaign" to associate him with "one of the most reviled terrorist regimes in the world." Nayeri claims this tactic undermined the presumption of innocence and violated his right to due process and equal protection under the law.

Most of the references to the Islamic Republic of Iran occurred while the prosecutor was questioning witnesses about the process by which Nayeri was extradited to the United States to face trial in this matter. The questioning made it clear that the extradition process was highly formalistic from both a legal and political standpoint.[5] So, it is hardly surprising that the prosecutor referred to Iran by its official name during that particular area of inquiry. The broader context of the questioning suggests that, rather than trying to link Nayeri to a "terrorist regime," the prosecutor was merely attempting to shed light on why it took officials so long to obtain Nayeri's presence for trial after he fled the United States. (See generally *Hardrick v. Lafler* (E.D. Mich. 2011) 2011 WL 596208 [evidence regarding the defendant's extradition was relevant to explain the delay in his prosecution and to show his consciousness of guilt in fleeing to another country].)

Other references to the Islamic Republic of Iran occurred during Nayeri's cross-examination. Working on the assumption that Iran would not look kindly on Nayeri's chosen career as a professional marijuana grower and

---

[5] Because Iran is a nonextraditable country, the police had to lure Nayeri out of Iran to a country that has an extradition agreement with the United States. To that end, the police got Shegerian to convince Nayeri to board a flight from Iran to Spain that had a stopover in the Czech Republic. During the stopover, Nayeri was arrested on a Czech warrant, and after a year of legal wrangling, he was finally handed over to the FBI so he could be taken to the United States for trial.

dealer, the prosecutor tried to make the point that it made no sense for Nayeri to flee to that country unless he was desperately trying to avoid responsibility for what he did to Michael. Here is how the questioning on that topic unfolded between the prosecutor and Nayeri:

"Q. What is the penalty, Mr. Nayeri, in [the] Islamic Republic of Iran for the cultivation, transportation and sale of five kilos of cannabis?

"A. The Islamic Republic of Iran does not recognize marijuana as a . . . drug in the first place.

"Q. So what happens if you get caught [growing marijuana] in Iran?

"A. They don't even recognize it as marijuana. I've been there. You want to know?

"Q. Well, I already know. I want these people (the jurors) to know. What happens if you get --

"A. Nothing.

"Q. Cultivating – nothing? That's your testimony?

"A. They eat marijuana seeds.

"Q. Iran does not have the death penalty, Mr. Nayeri?

"A. Heroin, maybe opium, things of that nature. Marijuana is not even recognized. They don't even know what marijuana is in Iran. They know hashish."

Two things stand out from this exchange. First, the prosecutor used Iran's popular name more often than its official name to describe the country to which Nayeri fled. This indicates the prosecutor was not bent on using the official name for some nefarious purpose. Second, the one time the prosecutor did use Iran's official name, he was merely trying to get Nayeri to adopt his understanding that, as an Islamic theocracy, Iran might not look

17

very favorably upon people who grow and sell marijuana. Nayeri, who also referred to Iran by its official name at one point, insisted that was not true, but that is beside the point. The context of the exchange reveals the prosecutor's reference to Iran's official name was not intended, nor likely, to prejudice Nayeri in any fashion.

Nayeri also contends that, by saying he knew what happens to people who grow marijuana in Iran, and then asking about the death penalty in Iran, the prosecutor implied he personally knew that Iran imposes the death penalty on marijuana dealers. Nayeri contends that was not only improper, given the absence of evidence concerning Iran's drug laws, it was legally incorrect because "Iran has not executed anyone for a crime involving marijuana in recent times."

However, the prosecutor's understanding of Iran's drug laws had little bearing on the case. The broader point of his questioning on this topic was to call into question Nayeri's motives and credibility, which were fair game once he took the witness stand. (See *Portuondo v. Agard* (2000) 529 U.S. 61, 69 ["when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness'"].)

Still, Nayeri takes issue with how the prosecutor addressed this topic in his closing argument. Striking a sarcastic tone, the prosecutor told the jury, "Although totally innocent, a professional cultivator, transporter and seller of cannabis, Nayeri goes to the Islamic Republic of Iran. His testimony on that was really good. We learned they execute people for transporting heroin, methamphetamine, cocaine and hashish. We're talking about a country that is, I think, they just put a satellite in orbit, and they're making great technical advances, which makes some people here kind of nervous. But [according to Nayeri,] they have not figured out [the] mystery of

18

where hashish comes from. He said they don't even know what marijuana is. Something tells me there's people in that country [who] are smart enough to know what marijuana is."

Nayeri claims the prosecutor's reference to Iran's "technical advances" was a scare tactic designed to draw the jury's attention to Iran's nuclear capabilities. In Nayeri's view, the reference was particularly incendiary because it came in the wake of the United States' withdrawal from the Iranian nuclear agreement, when President Trump was accusing Iran of harboring dangerous nuclear ambitions and threatening a travel ban against several Middle Eastern countries.[6]

No one would dispute that the United States and Iran have had an acrimonious relationship since the Iranian revolution in 1979, which is when Iran became officially known as an Islamic Republic. However, that does not mean Americans are incapable of judging Iranian Americans defendants in a fair and impartial manner. As the trial court noted in addressing this issue as part of Nayeri's new trial motion, "Orange County is home to many residents of Iranian or Persian descent who are the jurors' friends, neighbors, coworkers, or acquaintances. People, especially when serving as jurors, are able to differentiate between the acts of nations and the acts of people."

We agree. The diversity of race, culture, and ethnicity in Southern California is too great to assume the jury was prejudiced against

---

[6] Most Californians opposed the travel ban, even though it was prompted in part by a terrorist attack that occurred in San Bernardino in 2015. (See Public Policy Institute of California, "Majority Oppose Trump's Travel Ban" (Mar. 22, 2017) <https://www.ppic.org/press-release/majority-oppose-trumps-travel-ban/> [as of May 5, 2025], archived at: <https://perma.cc/5ZET-GB9A>.)

19

Nayeri merely because he was born in Iran and the prosecutor referred to Iran by its official name on a few occasions during the course of his long trial. Moreover, to guard against this possibility, the jury was repeatedly instructed not to let Nayeri's national origin, race, ethnicity, or religion influence its decision. (CALCRIM No. 200.) Because there is nothing in the record suggesting otherwise, we presume the jury followed those instructions in reaching its verdict. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

2. Referring to Nayeri by his First Name

Throughout the trial, the prosecutor referred to Nayeri by various names, including "the defendant," "Mr. Nayeri," "Hossein," and "Hossein Nayeri." Although he never objected on this basis in the trial court, Nayeri now contends it was improper for the prosecutor to call him Hossein because, as a recognizably Middle Eastern name, it was likely to evoke fear and loathing from the jury.

In so arguing, Nayeri relies on a research article indicating some Americans had a less favorable opinion of President Obama when his middle name "Hussein" was used in certain polling questions. (G. Williams, A. Guichard & J. An, "The Effects of Name and Religious Priming on Ratings of a Well-Known Political Figure, President Barack Obama," *PLoS ONE*, June 30, 2017, Vol. 12(6), <https://doi.org/10.1371/journal.pone.0180676> [as of May 5, 2025], archived at: <https://perma.cc/23W4-59DS>.) However, one of the studies cited in the article found the inclusion of President Obama's middle name did not significantly influence Americans' perception of him. (*Id.* at p. 2, fn. 15.) So, it is hard to tell exactly what effect a person's name can have on how people perceive them.

We do know, however, that Barack Hussein Obama was elected to our nation's highest political office not just once, but twice. This demonstrates the American people can look past a person's name and judge him based on considerations other than race and ethnicity. All things considered, we do not believe the prosecutor's references to Nayeri's first name were prejudicial. Although prosecutors should generally refrain from referring to the defendant by his first name only, the instances in which the prosecutor did so here are not cause for reversal. (Cf. *Commonwealth v. Alammani* (2003 Mass) 790 N.E.2d 222, 229 [the prosecutor did not render the defendant's trial fundamentally unfair by referring to him by his middle name "Arafat"].)

3. Peaky Blinders

Peaky Blinders is a British television drama. While cross-examining Nayeri, the prosecutor referenced the show during an exchange that was intended to establish that Nayeri had a closer relationship with codefendants Handley and Kevorkian than Shegerian did. Nayeri contends the exchange was improper because it brought up his Iranian heritage and highlighted his custodial status, but we disagree.

During the trial, Nayeri tried to distance himself from Handley and Kevorkian, suggesting they were just as close to Shegerian as they were to him. To counter this narrative, the prosecutor asked Nayeri which side of the aisle Handley and Kevorkian would have sat on if they had attended his and Shegerian's wedding, the bride or the groom. But before asking this question, the prosecutor wanted to make sure Nayeri understood the traditional seating protocol at American weddings. To that end, he asked Nayeri, "Ever seen one of those wedding scenes, ever seen Peaky Blinders? I don't know if they had that in Iran. They probably show [it] in jail. It's a show

21

on Netflix. It's a pretty essential wedding scene. The bride side on one side. Groom side is on the other."

In answering the question, Nayeri did not reveal whether he was familiar with Peaky Blinders, but he did make it clear that he was familiar with this seating tradition. He also admitted that if his codefendants had attended his and Shegerian's wedding, they would have sat on his side of the aisle, not hers.

While Nayeri does not dispute the relevancy of this evidence, he maintains the Peaky Blinders question was improper because it emphasized his ties to Iran and alluded to the fact he was in custody during the trial. However, the reference to Iran was fairly innocuous, and even if the prosecutor had not brought it up, the jury would have known Nayeri was in custody because during his testimony, he admitted he was apprehended after breaking out of the Orange County jail prior to trial. Therefore, the prosecutor's question was not improper or prejudicial. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1336 [a prosecutor's reference to the defendant's custodial status generally will be deemed harmless if the evidence makes it clear the defendant was in custody during the trial].)

4.  Ali Baba's Treasure

Nayeri also takes aim at a reference the prosecutor made in closing argument to the fictional character Ali Baba. The reference occurred while the prosecutor was discussing a statement that Nayeri had made to Shegerian while he was tracking Michael on his computer a few weeks before the kidnapping occurred. On that occasion, Michael was out in the desert exploring a potential mining investment. However, not knowing the purpose of Michael's desert outing, Nayeri suggested to Shegerian that Michael was looking for a place to bury all of his cash.

During closing argument, the prosecutor argued that statement reflected Nayeri's motive for the kidnapping. He told the jury that, "Even [Nayeri] admitted that conversation was about money. In his brain, Ali Baba's treasure[] is buried out in the desert. That's what he's starting to think" while he was tracking Michael out in the desert on that particular occasion.

In the Middle Eastern tale of Ali Baba and the Forty Thieves, the title character discovers entry into a treasure laden den by uttering the magical words "Open Sesame!"[7] Although the original version of the story portrayed Ali Baba as a kind and caring man, he was often represented in a negative light in cartoon versions of the story that appeared on American television screens in the 1930's and 40's. Indeed, those early animations tended to depict all Middle Eastern men as conniving savages. (See N. Al-Ghamdi & R. Khalid Safrah, "Islamophobia in the Western Media: A Linguistic Investigation of Two Counter Arguments," *Talent Development & Excellence*, June 2020, Vol. 12, No. 2s, pp. 3061, 3072-3074.)

In recent years, the Ali Baba story has received more culturally sensitive treatment in some quarters. (See, e.g., A. Flood, "New Arabian Nights Translation to Strip Away Earlier Versions' Racism and Sexism," *The Guardian*, Dec. 15, 2021.) However, Nayeri fears that by likening him to Ali Baba, the prosecutor intentionally conjured up some of the older bigoted images of Persians to create a racialized impression of his Islamic heritage and to disparage him in the eyes of the jury.

---

[7] For an overview of the story, see Wikipedia, the Free Encyclopedia, Ali Baba and the Forty Thieves, Story Section, <https://en.wikipedia.org/wiki/Ali_Baba_and_the_Forty_Thieves> [as of May 5, 2025], archived at: <https://perma.cc/2VB2-54UN>.

In defending the comparison, respondent correctly notes that, in reviewing a claim of prosecutorial misconduct, courts "'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Centeno, supra,* 60 Cal.4th at p. 667.) While not disputing that comparing an Iranian defendant to Ali Baba could have racist overtones, respondent insists the prosecutor's comparison was fitting here because, just as Ali Baba did in the ancient tale, Nayeri was hoping to discover hidden treasure out in the wilderness. In other words, respondent defends the Ali Baba comparison on the basis it was an analogy, not an epithet. (See *People v. Torres* (1982) 133 Cal App 3d 265, 281 [prosecutor's comparison of the defendant to Don Quixote was not considered a racial slur because it was based on the defendant's actions, not his race], disapproved on other grounds in *People v. Barnum* (2003) 29 Cal.4th 1210; compare, *People v. Thompson* (2022) 83 Cal.App.5th 69, 93–96 [prosecutor's comparison of the defendant to a scorpion was improper to the extent it was racially derogatory and improperly suggested the defendant had a natural predilection to do harm].)

As our Supreme Court explained in *People v. Ghobrial* (2018) 5 Cal.5th 250, prosecutors have wide latitude to draw upon matters from common experience, history, or literature in making their arguments to the jury. (*Id.* at p. 289.) During the penalty phase of the trial in that case, the prosecutor made a variety of references to the defendant's Egyptian nationality, as well as to Osama bin Laden, Al Qaeda, and the then-recent terrorist attacks of September 11, 2001. (*Id.* at p. 287.) The defendant claimed the references fueled anti-Arab sentiment, but the Supreme Court disagreed. It found no misconduct because the prosecutor never argued the defendant was guilty "because of any connection with September 11, the

24

terrorists, or their racial or national background." (*Id*. at p. 290.) In addition, the defendant's jury "had already heard testimony regarding [his] life in Egypt and about his emigration to the United States. In context it [was] clear that the prosecutor was not [attempting] . . . to inflame the jury's biases, but instead to minimize the emigration impact of defendant's lack of criminal history and evidence concerning his mental health." (*Id*. at p. 291.)

The same reasoning applies in this case. The prosecutor did not argue Nayeri was guilty because of his common ancestry with the character Ali Baba. Nor did he reference that character as a way to disparage Nayeri's background or beliefs. (Compare *United States v. Runyon* (4th Cir. 2013) 707 F.3d 475, 493–494 [condemning prosecution evidence that personally targeted the defendant's ethnicity and religion].) Instead, the prosecutor simply drew a comparison between Nayeri's and Ali Baba's behavior and motives based on the evidence that was adduced over the course of Nayeri's trial. Therefore, even if the reference to Ali Baba was improper, it was not likely to have inflamed the jury's passions or otherwise rendered Nayeri's trial unfair.

Indeed, if that had been the case, the jury probably would have blindly convicted Nayeri across the board of all charges. However, despite the Ali Baba comparison, and all of the other allegedly racist tactics the prosecutor employed, the jury hung on one of the counts and found one of the enhancement allegations not true. This shows the jury remained objective and carefully considered the evidence as to each charge. (*People v. Williams* (2013) 218 Cal.App.4th 1038, 1073.) Therefore, we reject Nayeri's claim that the prosecutor committed prejudicial misconduct by referring to his Iranian heritage during the trial.

25

That is not to say we approve of the Ali Baba reference or encourage the use of such references in future cases. While prosecutors are free to draw on historical and literary references in making their arguments to the jury, they should steer clear of ones that have the potential to bring attention to the defendant's race or ethnicity. Otherwise, they run the risk of polluting the record with reversible error. As a highly experienced trial attorney, the prosecutor in this case should have known this and avoided the Ali Baba reference altogether.

The state does not dispute this. To the contrary, the Deputy Attorney General who appeared before us at oral argument conceded the prosecutor's references to Ali Baba was ill-advised in a case involving a defendant of Middle Eastern descent. However, for the reasons explained above, we do not believe his remarks rose to the level to require a reversal of Nayeri's convictions.

In reaching this conclusion, we are mindful that the Legislature, through the passage of the Racial Justice Act of 2020 (RJA), has emphasized the need to eliminate racial bias in our criminal justice system. (See § 745; *People v. Wilson* (2024) 16 Cal.5th 874, 944–945.) We respect and share that laudatory goal. However, apart from mentioning the overarching policy objective behind the RJA, Nayeri has not provided any sort of substantive analysis of how the RJA might aid him, separate and apart from his common law theories of misconduct. (See *People v. Lashon* (2024) 98 Cal.App.5th 804, 816, fn. 6 [noting that RJA and common law misconduct claims are separate and distinct for analytical and briefing purposes].) Accordingly, we express no opinion on the RJA's applicability in this case. (*300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257 [appellant forfeited argument "by failing to brief it properly under

26

a separate heading" and "failing to provide adequate legal analysis"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties"].)

## D. *Nayeri's Cross-Examination*

To no one's surprise, the prosecutor's cross-examination of Nayeri was long and contentious. However, Nayeri asserts the prosecutor was so aggressive, argumentative, and antagonistic in his questioning that he crossed the line between permissible inquiry and unfair badgering. As proof of this, Nayeri relies on the fact that the prosecutor attempted to limit his answers to simple "yes or no" responses at various points during his cross-examination, including during this exchange about the nature of the marijuana business:

"Q. . . . You agree with me that the marijuana business is filled with violent criminals; would you agree?

"A. Not at all. It's actually a pretty laid back business.

"Q. Okay. Was it laid back when Michael got his penis cut off?

"A. Things happen in this business, but it's not something that happens quite often. This is a very laid back business overall.

"Q. There are a lot of criminals that are involved in the marijuana business? 'Yes' or 'no'?

"A. You could consider just about all of them criminals if you want to.

"Q. 'Yes' or 'no,' lots of criminals involved in [the] marijuana business? 'Yes' or 'no'?

"A. Everyone's a criminal if you look at it the way - -"

27

At that point, the judge admonished Nayeri to answer the question yes or no. Nayeri insisted the question was not susceptible of such a simple response, but he eventually agreed with the prosecutor that the marijuana business can be violent at times.

That was not the only testy exchange between the two. Later during cross-examination, when Nayeri responded to a question with a question of his own, the prosecutor told him, "I'm not answering any of your questions. It's going to go the other way around." However, in response to a question posed to him a few moments later, Nayeri asked the prosecutor, "Are you going to start telling the truth once in a while?" That led the judge to admonish Nayeri against making gratuitous statements. Yet, during subsequent questioning, Nayeri posed further questions to the prosecutor, and he also accused the prosecutor of "shov[ing answers] down [his] throat" and trying to "box him in" with his questions.

There were also several instances on cross-examination where Nayeri and the prosecutor interrupted each other and/or talked over one another. The trial judge admonished both of them to be respectful and let the other person finish speaking before responding. Nevertheless, as the questioning wore on, there were more contentious exchanges, including this one at the end of the initial round of cross-examination:

"Q. All right. I just have one last question for you. [¶] When you were out in the desert with Michael and you cut off his penis, why couldn't you just leave it there in the hopes it could be reattached?

"A. You're done?

"Q. You want to give us an answer for that?

"A. I'm going to give you an answer for that, personally.

28

"Q. Personally, I'm done? Is that what you said? I'm done? What does that mean, Mr. Nayeri?

"A. I said, 'Are you done'?

"Q. Okay. So my question to you - -

"A. I'm not going to even answer your question.

"Q. Okay.

"A. You don't even deserve an answer to that.

"Q. Okay.

"A. Nice try.

"Q. . . . I'm going to give you one last chance here. Family is in the courtroom. Why did you take it [Michael's penis] with you? You want to give us an answer to that?

"A. You don't deserve an answer.

"Q. Nothing further.

"[Nayeri]: Go ahead. Sit down."

Nayeri contends that, besides being argumentative, there was an insufficient factual basis for this line of questioning because, even assuming he was one of the kidnappers, there was no direct evidence that he was the person who severed Michael's penis. However, because the evidence established the defendants were working together when they held Michael down and cut off his penis, the prosecution argued Nayeri was guilty as either the direct perpetrator or as an aider and abettor. So, when the prosecutor asked Nayeri why he severed Michael's penis, the question did not necessarily pertain to Nayeri alone. Rather, the prosecutor was trying to figure out why Nayeri and/or his cohorts cut off Michael's penis and absconded with it. Because there was ample evidence that at least one of the defendants did that, the question was not improper.

Nayeri also claims the prosecutor's reference to "[f]amily . . . in the courtroom" was an improper attempt to garner sympathy for Michael and his family. (See generally *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [appeals for sympathy for the victim are inconsistent with an objective determination of guilt].) But the context of the exchange shows the prosecutor was just trying to figure out a way to get Nayeri to answer the question. In the face of Nayeri's obstinate responses, the prosecutor was within his rights to press him for a truthful response. He did not have to limit his questions to topics that Nayeri was comfortable talking about or accept Nayeri's answers at face value. (See *People v. Chatman* (2006) 38 Cal.4th 344, 382–383 [the permissible scope of cross-examination is very wide when the defendant takes the stand in his own defense].)

Regardless, the record shows Nayeri held his own and gave as good as he got over the course of his cross-examination. The above exchange about the severing of Michael's penis illustrates as much, but that was not the only time Nayeri stood up to the prosecutor's accusations. At several other points during the questioning, Nayeri vehemently disputed the prosecutor's understanding of certain issues in the case. And during one exchange, he even accused the prosecutor of being clueless about what he was talking about. These are not the signs of a defendant who was browbeaten into submission or rolled over in the face of tough questioning.

Although Nayeri accuses the prosecutor of being heavy-handed and intentionally trying to "get under his skin," we must remember that cross-examination is a search for the truth. Indeed, cross-examination has been described as "critical for ensuring the integrity of the factfinding process," and "'the principle means by which the believability of a witness and the truth of his testimony are tested.'" (*Kentucky v. Stincer* (1987)

30

482 U.S. 730, 736.) Thus, "assertive and even harsh questioning" is allowed. (*People v. Armstrong* (2019) 6 Cal.5th 735, 796.) We do not believe the prosecutor overstepped the permissible bounds of cross-examination in his questioning of Nayeri.

## E. Presenting Previously Excluded Evidence

Nayeri alleges the prosecutor committed misconduct by introducing evidence at trial that was excluded at his preliminary hearing. As we explain below, however, the magistrate's exclusion order was limited to the preliminary hearing, and there is no evidence the prosecutor acted in willful disregard of the order by offering the subject evidence at trial. We thus find no misconduct.

### 1. Factual Background

At the preliminary hearing, Newport Beach Police Sergeant Ryan Peters testified at length about his investigation on the case. When the prosecutor asked him about his interviews with Shegerian, the defense objected on the grounds of spousal privilege. (See Evid. Code, § 980.) The defense argued the privilege prohibited Peters from divulging any statements from Shegerian that encompassed communications between her and Nayeri. In response, the prosecutor pointed out the spousal privilege does not extend to communications intended to aid the commission of a crime. (Evid. Code, § 981.) Ultimately, the magistrate deferred ruling on the objection until Peters completed his testimony.

Peters testified that Shegerian told him that she received a phone call from Nayeri in the early morning hours of October 2, 2014, not long after Michael and Mary were discovered out in the desert by the authorities. According to Shegerian, Nayeri directed her to put money in the meter where

31

Handley's pickup truck was parked on the Balboa Peninsula, and she followed his command.

In regard to the parking meter statement, the magistrate ruled, "For purpose of this hearing, I won't consider that statement in making my decision [about whether to bind Nayeri over for trial]. So, I'll sustain the [spousal] objection as to that single statement." Subsequently, during Nayeri's trial, the prosecution alluded to the statement in its opening statement to the jury, and it elicited the statement from Shegerian during her testimony. Defense counsel did not object at either juncture.

2. Analysis

Despite his failure to object below, Nayeri argues it was improper for the prosecution to bring up the parking meter statement at trial. In so arguing, Nayeri claims the prosecution conceded in its trial brief that the statement was protected under the spousal privilege. However, that is not correct. The prosecution's brief actually makes no mention of the parking meter statement.

Nayeri also contends the prosecutor's use of the parking meter statement at trial violated the magistrate's ruling at the preliminary hearing. However, "a claim of misconduct based on allegations that the prosecutor elicited evidence in violation of a court order requires proof that the prosecutor acted *deliberately or intentionally*. [Citations.]" (*People v. Molano* (2019) 7 Cal.5th 620, 675, italics added.) In this case, the magistrate's ruling at the preliminary hearing was narrow; it only applied for purposes of determining whether there was sufficient evidence to hold Nayeri over for trial. Given the limited scope of the ruling, we do not believe the prosecutor deliberately or intentionally violated it by offering the challenged evidence at trial. (See *People v. Stanley* (2006) 39 Cal.4th 913, 959 [a trial court's ruling

32

limiting the use of certain evidence for one purpose does not preclude the prosecutor from using the evidence for another purpose].) Therefore, there was no misconduct.

*F.  Referencing Facts Not in Evidence*

Nayeri contends the prosecutor prejudicially referenced facts that were not in evidence during his cross-examination. We disagree.

The first alleged instance of improper referencing occurred when the prosecutor was questioning Nayeri about his vehicular manslaughter case from 2005. On direct examination, Nayeri had testified that the victim in that case was his best friend, Ehsan, so he was naturally very remorseful over the incident. In fact, he said he was so full of regret that he visited Ehsan's grave regularly when he returned from Iran, even though he was on the lam and there was a warrant out for his arrest at that time.

On cross-examination, the prosecutor tried to discredit Nayeri on that topic by bringing up Ehsan's family. The prosecutor wanted to establish that Ehsan's family resented Nayeri so much for killing Ehsan that Nayeri would not have risked going to Ehsan's grave out of fear the family would see him there and report him to the authorities. To that end, the prosecutor asked Nayeri, "You know [Ehsan's family] hate[s] your guts; right?" Nayeri replied, "I think you're absolutely wrong. But go ahead and say that." Then the prosecutor asked Nayeri, "Ali (Ehsan's brother) hates your guts; fair to say?"

Even though defense counsel's objection to the question was overruled, the prosecutor rephrased it and asked Nayeri if he believed that Ehsan's family held him responsible for Ehsan's death. Nayeri answered, "I don't know. You should ask them that," to which the prosecutor responded, "I have."

Nayeri claims that by responding in such a personal fashion, the prosecutor became a witness to a fact that was not in evidence, namely that Ehsan's family held Nayeri responsible for Ehsan's death. Respondent concedes the prosecutor's personal response was ill-advised and inappropriate. We agree. However, respondent claims it did not rise to the level of reversible misconduct because it was not a deceptive or reprehensible method of persuasion.

We again agree with respondent. It appears from the record that the prosecutor merely got caught up in the moment and responded reflexively to Nayeri's remark. While the prosecutor should not have taken Nayeri's bait and alluded to his personal involvement in the investigation, his fleeting comment was not reasonably likely to have a material influence on the jury's assessment of Nayeri's credibility or the ultimate outcome of the case.

During cross-examination, the prosecutor also questioned Nayeri about how he knew Michael was the victim of the kidnapping in this case before Michael's name was released to the press. The questioning was designed to show Nayeri was more involved in the kidnapping than he led on in court. Although Nayeri insisted he learned Michael's name from Shegerian after she attended Handley's arraignment, the prosecutor insinuated that was a lie because the minute order of the arraignment hearing does not mention Michael's name, and it also shows that Handley's attorney "waived reading and advisement." In light of those circumstances, the prosecutor proceeded on the assumption that Michael's name was never mentioned at the arraignment, when he questioned Nayeri on this topic. Defense counsel objected to that assumption on foundational grounds, but the objection was overruled.

And for good reason, too. Nayeri argues that irrespective of what the minute order of Handley's arraignment does or does not show, it is still possible that Michael's name was mentioned at the arraignment. Therefore, it was improper for the prosecutor to assume otherwise. However, "'When a defendant voluntarily testifies, the district attorney may fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them.'" (*People v. Chatman, supra,* 38 Cal.4th at p. 382.) This includes evidence that is harmful to the defendant, so long as the prosecutor has a good faith belief that such evidence exists and can be proved. (*People v. Bolden* (2002) 29 Cal.4th 515, 562; *People v. Mooc* (2001) 26 Cal.4th 1216, 1233.)

Here, there was sufficient evidence to support the prosecutor's line of questioning. As we have noted, the minute order of the arraignment hearing is bereft of Michael's name, and Handley's counsel waived a reading of the charges at the hearing. In addition, the underlying complaint referred to Micheal by a pseudonym, not his real name.

Taken together, these circumstances reasonably justified the prosecutor's belief that Michael's name was never mentioned at the arraignment hearing. Therefore, the prosecutor was within his rights in questioning Nayeri with this in mind. The questioning on this topic did not violate Nayeri's fair trial rights.

G. *Closing Argument*

Nayeri would also have us believe the prosecutor committed misconduct in a variety of ways throughout his closing argument. We are not persuaded.

### 1. Giving Personal Opinions

Nayeri contends the prosecutor improperly expressed his personal opinions in closing argument by describing him as deceitful and untrustworthy. In that regard, the prosecutor submitted that Nayeri was like a cult leader who had used his powers of persuasion to convince the jury that he was telling the truth, when he had actually lied under oath. The prosecutor added, "I don't care if he lies to me," but "[i]t's not okay to lie to you." He also warned the jurors that if they fell for Nayeri's story and acquitted him of the charges, they would come to regret it as time went on.

Nayeri sees these remarks as improperly reflecting the prosecutor's personal opinions about his credibility, but they were not made in a vacuum. Throughout his closing argument, the prosecutor pointed to many instances where Nayeri's testimony was contradicted, either directly or indirectly, by other evidence in the case. The prosecutor also highlighted evidence that made Nayeri appear cunning and manipulative, such as his efforts to control Shegerian and flee the country. Because there was a strong evidentiary basis for the prosecutor's argument, he did not commit misconduct by characterizing Nayeri as manipulative and dishonest. (See *People v. Dennis* (1998) 17 Cal.4th 468, 522 ["Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie"]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1040 [the evidence supported the prosecutor's argument that the defendant was a "'pathological liar'" and one of the "'greatest liars'" of all time].)

During closing argument, the prosecutor also commented on the testy exchange that occurred when he asked Nayeri why, after severing Michael's penis, he took the appendage with him instead of leaving it at the

scene. The prosecutor described Nayeri's answers and demeanor as being "menacing" toward him, even though he had been a "professional prosecutor" for 26 years and the exchange occurred in the presence of the bailiff and other armed officers. Believing the exchange reflected poorly on Nayeri's credibility and character, the prosecutor told the jury that, based on everything it heard, "I guarantee you're holding that man accountable for what he did."

Although Nayeri claims this amounted to an improper personal opinion, prosecutors are allowed to comment on the defendant's behavior in the courtroom. (*People v. Jackson* (1989) 49 Cal.3d 1170, 1205–1206; *People v. Edelbacher, supra*, 47 Cal.3d at pp. 1030–1031.) While, as respondent concedes, the prosecutor should have refrained from implying that he *personally* found Nayeri's behavior to be threatening, the prosecutor laid out the specific aspects of Nayeri's testimony from which the jury could assess his demeanor and credibility. Because the prosecutor's argument was grounded in the evidence of the case, the references to his own experience and feelings were not likely to have a material impact on the jury's decision-making process.

2. Improper Vouching

In response to Nayeri's claim that the police framed him by planting his DNA on the glove that was found in Handley's truck, the prosecutor argued the police investigators in this case were "fine people" who did "incredible work" in terms of uncovering Nayeri's involvement in Michael's kidnapping. The prosecutor also argued it would be an insult to the investigators, and to the jurors' own intelligence, if they believed Nayeri's story that he was framed.

Nayeri maintains these comments constituted impermissible vouching, but the prosecutor made them as he was recounting what the police

actually did in the case. In other words, the prosecutor was tailoring his argument to the facts. He was not suggesting the jury should convict Nayeri simply because he or anyone else believed he was guilty. Seeing that they were grounded in the evidence that was presented at trial, and not on some outside source of knowledge that was unavailable to the jury, the prosecutor's remarks were not improper. (*People v. Wright* (2021) 12 Cal.5th 419, 446–447.)

The same reasoning applies to an argument the prosecutor made about the proffer Shegerian made to the police before trial, which ultimately led to her getting immunity from prosecution. The prosecutor told the jury that while criminal suspects often try to cut a deal with authorities to avoid going to prison, "You know somebody is telling you the truth in a proffer when they come in and they tell you things that make them look horrible that nobody else knows about."

Nayeri sees this as improper vouching, but in presenting this argument to the jury, the prosecutor backed up his claim by pointing to specific aspects of Shegerian's proffer that painted her in a negative light. For example, Shegerian admitted doing research on Micheal and helping Nayeri conduct surveillance on him before the kidnapping, and she also admitted going along with Nayeri's nefarious plan to poison Michael's parents' dog. Because the prosecutor's argument about Shegerian's proffer to the police was factually based, and not derived from his own personal opinion, it did not amount to improper vouching. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329.)

Nayeri also faults the prosecutor for using the personal pronoun "we" during closing argument. For instance, while the prosecutor was making his case to the jurors, he repeatedly talked about the evidence "we" heard

during the trial and the arguments "we" heard defense counsel making during his closing. Nayeri suggests this was the prosecutor's clever way of pitting the jurors against him and getting them to see the case from the prosecutor's perspective, as opposed to a fair, impartial and objective point of view.

We are not persuaded. "Although this use of 'we' may align the prosecutor with the jurors, it does not necessarily exclude the defendant because the 'we' could reasonably be interpreted in this context to refer to everybody who was in court when the evidence was presented." (*Nunn v. State* (Minn. 2008) 753 N.W.2d 657, 663.) As such, the prosecutor's pronoun choices are not grounds for reversal. (*Ibid.*)

3. Comment About Defense Counsel's Job

Nayeri argues that during closing argument, the prosecutor criticized or denigrated his counsel by suggesting that it was defense counsel's "job" to prevent witnesses from explaining their testimony. To understand this argument requires a closer look at the context in which the prosecutor's remark was made.

In closing argument, defense counsel commented on Nayeri's sometimes "combative" demeanor while testifying. Counsel explained there were rules that needed to be followed at trial and indicated the prosecutor had followed those rules. He conceded that, during cross-examination, the prosecutor "gets to dictate whether [the answers] are a yes-or-no answer." Counsel went on to explain the rules can be very frustrating, and he referenced the frustration Nayeri exhibited when the prosecutor during cross-examination insisted on a yes or no answer. Counsel asserted this would be frustrating for anyone and was particularly so for Nayeri, given the stressful and tense position he was in. The apparent purpose of this portion of

39

counsel's argument was to explain Nayeri's hostile demeanor during cross-examination, not to accuse the prosecutor of misconduct.

Nevertheless, the prosecutor appears to have taken offense. On rebuttal, the prosecutor argued he had the right to question Nayeri vigorously because Nayeri was being obstinate on the witness stand. He then stated, "I didn't prevent explanations ever. That's the defense lawyer's job."

The prosecutor's rebuttal was clearly in response to defense counsel's assertion the prosecutor had limited (or attempted to limit) Nayeri's answers on cross-examination to yes or no. Despite defense counsel's acknowledgement that the prosecutor had "followed the rules," the prosecutor evidently believed defense counsel had accused him of wrongdoing for preventing Nayeri from expanding his answers beyond yes or no, and in context we understand his comment about defense counsel's "job" to simply state his view that, once Nayeri decided to testify, it was up to his counsel to elicit whatever explanations from Nayeri he thought were necessary to explain or elaborate on the previous "yes or no" answers.

Perhaps the prosecutor could have been more articulate in explaining the purpose of redirect examination, but then, defense counsel could have been more articulate in explaining "the rules" as he referred to them.

In any event, the prosecutor's remark about defense counsel's job could not have been prejudicial in the grand scheme of things. During the evidentiary phase of trial, both sides objected to certain testimony, so the jury would have known that the responsibility of dutiful counsel includes attempting to exclude unfavorable evidence. Moreover, during his closing argument, the prosecutor repeatedly complimented defense counsel on his trial skills and made clear that he respected him for providing Nayeri with a

vigorous defense. Thus, the jury would have understood that the challenged remark was an isolated comment made in the heat of battle and that the prosecutor did not mean to suggest that defense counsel had done anything improper in his defense of Nayeri.

4. Improper Name Calling

During closing argument, the prosecutor also called Nayeri a "jackass" for the way he treated Shegerian during their marriage. Although that remark did not draw any objection from defense counsel, the prosecutor came back to it later in his argument, following a break in the proceedings. He told the jurors, "I want to ask you to forgive me. Sometimes I'm getting a little fired up in this case. Obviously, I have some strong feelings on this case. I shouldn't be calling the defendant a jackass. Mostly because that doesn't even come close to really describing this case[.]"

We agree with Nayeri that the prosecutor's apology came off as half-hearted because it clearly implied he thought Nayeri was much worse than just a jackass for what he allegedly did to Michael. However, while we do not "condone the use of opprobrious terms in argument, . . . such epithets are not necessarily misconduct when they are reasonably warranted by the evidence." (*People v. McDermott* (2002) 28 Cal.4th 946, 1002.) In light of what the evidence revealed in this case, the "jackass" comment was not over the top. (See *People v. Nadey* (2024) 16 Cal.5th 102, 184–187 [evidence supported the prosecutor's reference to the defendant as a "'depraved cancer,'" a "'tattooed hyena,'" and a "'vile, nasty predator'"]; *People v. Jones* (1998) 17 Cal.4th 279, 309 [upholding the prosecutor's comparison of the defendant to a "terrorist"].)

Furthermore, the jury was repeatedly instructed that it had to decide the case based on the evidence presented at trial and not the

41

statements of the attorneys. (See CALCRIM Nos. 104 ["Nothing that the attorneys say is evidence"]; 222 [same]; 200 ["It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial"].) And during deliberations, the jury made multiple requests to have witness testimony read back to them, which shows it took those instructions to heart. We do not believe the jury was improperly influenced by the prosecutor's "jackass" remark.

5. Commenting on an Abandoned Defense Theory

In his opening statement to the jury, defense counsel asserted that the evidence would show the charged offenses were carried out by Mexican gang members, not Nayeri. However, this theory did not pan out during the course of the trial. Nayeri contends the prosecutor took unfair advantage of this fact in his closing argument, but as we now explain, that is not the case.

Nayeri's third party culpability theory rested on the expected testimony of Nawal Figueroa, a recovering drug addict with a checkered past that included multiple stints in prison. According to defense counsel's opening statement, Figueroa was prepared to testify that she met Kevorkian's ex-wife Marisol Garcia in prison around 2017, while Nayeri's case was pending trial.[8] Garcia was a gang member with "lots of criminal issues." She and Figueroa became friends while incarcerated, and at one point, she told Figueroa that she had helped Kevorkian commit a crime. In particular, she said she had put Kevorkian in touch with gang members from her neighborhood who had helped him carry out a kidnapping.

---

[8] Kevorkian married Garcia after divorcing his first wife, codefendant Rhodus.

42

Based on Figueroa's anticipated testimony regarding that conversation, defense counsel told the jury the evidence would show Kevorkian and Handley committed the charged offenses along with Mexican gang members, and not Nayeri. But, as it turned out, Figueroa refused to comply with a defense subpoena and hid out in an undisclosed location until the trial was over. Thus, the defense was unable to call her as a witness at trial.

The defense was not able to secure testimony from Garcia either. When questioned by the defense outside the presence of the jury, she invoked her privilege against self-incrimination and refused to answer questions about any conversations she may have had with Figueroa, or her relationship with Kevorkian. Garcia also refused to say whether she has ever associated with a criminal street gang known as Oxnard 13.

The trial court sustained Garcia's invocation of her Fifth Amendment privilege. It also denied defense counsel's request to call Garcia to the stand for the limited purpose of allowing the jury to see her gang tattoos. However, the court did not preclude the defense from showing Garcia's alleged gang ties by other means.

During closing argument, the prosecutor told the jurors it was important for them to distinguish between the evidence the attorneys expected to put on at trial, and the evidence that was actually produced during the trial. In so doing, the prosecutor alluded to defense counsel's claim in opening statement that he intended to present evidence showing it was Mexican gang members, not Nayeri, who committed the charged offenses. While acknowledging "trials are fluid," and it was "certainly not [defense counsel's] fault," the prosecutor pointed out there was no actual evidence to support the gang member theory "except for maybe [Nayeri] himself referring

43

to . . . Garcia as a gangbanger girlfriend [of Kevorkian]. That's literally the only evidence we heard about" that.

Nayeri argues that comment was improper because the prosecutor knew from his own personal knowledge about the case that Garcia was actually in a gang and that she presumably had the capability to put Kevorkian in touch with Mexican gang members. In so arguing, Nayeri relies on cases in which prosecutors have been rebuked for making knowingly false statements in regard to evidence that had been excluded from the trial. (See, e.g., *People v. Varona* (1983) 143 Cal.App.3d 566, 570; *People v. Castain* (1981) 122 Cal.App.3d 138, 146.)

In this case, however, the trial court did not prohibit the defense from offering evidence about Garcia's alleged gang ties; rather, it simply upheld Garcia's Fifth Amendment privilege not to testify about them herself. The defense was free to establish Garcia's gang ties through other means, and Nayeri admits he had ample opportunity to do so. For example, he could have called a police officer with knowledge of the Oxnard 13 gang to testify that Garcia was a member of that outfit.

Under these circumstances, the prosecutor was not out of line for commenting about the lack of evidence on this issue. Instead of creating the misleading impression that such evidence did not exist, he merely pointed out that defense counsel failed to prove that it did, which was wholly within his rights. (*People v. Varona, supra,* 143 Cal.App.3d at p. 570.) Therefore, his remarks were not improper.

6.  Pressuring the Jury to Convict

Nayeri claims that, in his zeal to obtain a conviction, the prosecutor exerted improper pressure on the jury during his closing argument. He cites multiple examples where this allegedly occurred.

44

First, while discussing Nayeri's testimony, the prosecutor belittled Nayeri's claim that his toes were badly injured in the crash that led to his vehicular manslaughter conviction back in 2005. Although Nayeri claimed the injury has caused him much pain over the years, the prosecutor stated, "Nayeri got drunk, he crashed, he killed his best friend. [As for his injured toes, I'm] still trying to figure out are we supposed to feel bad for him on that? Because the injury that he received? He lost a toe, his friend lost his life. [And] our victim lost something really important, too. [¶] I guarantee you Michael would [gladly] trade a toe" for what he lost. The prosecutor also accused Nayeri of being highly manipulative and leaving a trail of destruction behind him everywhere he went.

Nayeri submits these remarks were intended to evoke sympathy for Michael while inflaming the jury's passion against him. However, prosecutors are allowed to use a "wide range of descriptive comment," including "colorful terms," in their closing arguments. (*People v. Williams* (1997) 16 Cal.4th 153, 221.) We reject Nayeri's claim that the prosecutor was required to take a more clinical approach to the evidence in arguing his case to the jury. (*People v. Tully* (2012) 54 Cal.4th 952, 1021 [a prosecutor's use of derogatory epithets to describe a defendant or his conduct is not necessarily misconduct].)

During his closing argument, the prosecutor also asserted Michael deserved to know what Nayeri did with his penis, and it would deny Michael justice if the jury came back with a hung verdict. In addition, the prosecutor told the jurors that justice for Michael and Mary would be in "major jeopardy" if they fell victim to Nayeri's powers of manipulation and that he "pray[ed]" that did not happen. The prosecutor also urged the jury to convict Nayeri because it was the "right" thing to do. However, he

45

acknowledged the police and the prosecution are fully capable of making mistakes from time to time. And, he recognized as well that justice can be achieved through an acquittal, if the facts of the case called for that result.

Contrary to Nayeri's belief, these arguments were not improper for appealing to the jury's sense of justice and decency. (See *Bedford v. Collins* (6th Cir. 2009) 567 F.3d 225, 234 ["Nothing prevents the government from appealing to the jurors' sense of justice . . . or from connecting the point to the victims in the case"]; *People v. Wash* (1993) 6 Cal.4th 215, 261–262 [urging the jury to do the right thing and restore confidence in the criminal justice system by voting for the death penalty did not rise to the level of prejudicial misconduct]; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 511–513 [prosecutor's plea for the jury to restore order and justice did not constitute prejudicial misconduct].)

Nor were they particularly inflammatory. While the prosecutor encouraged the jury to convict in the name of justice, he admitted that justice does not require a conviction in every case. In so doing, the prosecutor made it clear that justice is factually driven. At no point did he urge the jurors to convict at any cost or to rely on improper considerations in reaching their decision. (Compare *United States v. Polizzi* (9th Cir. 1986) 801 F.2d 1543, 1558 [prosecutor committed misconduct in closing argument by telling the jury a conviction was required to "'finish the job that the F.B.I. started'" because it implied the jury had an obligation other than weighing the evidence].) Because of that, and because the challenged remarks constituted only a small portion of the prosecutor's argument, they did not render Nayeri's trial unfair.

Nayeri's final claim of undue pressure centers on the prosecutor's remarks about how the jurors should go about their deliberations. He told

them, "[D]ivergent views are totally okay. But part of the job of a juror is if you . . . bought into [Nayeri's] manipulation [and were impacted by the] laser beam of control that he has[, it is] very, very important that you listen to the other people [on the jury]. And for the other people that don't buy [Nayeri's] program, be patient with those who need to come around a little bit more. [¶] . . . You'll get to the right decision, but a verdict is very important. Be patient and listen. Very, very important. Of course, you know, if somebody doesn't do that, we used to have an old instruction, sense of pride may be aroused, like always keep an open mind. We switched over [to] a different set of jury instructions [that say if] somebody [is unwilling to do] that, you don't [keep] deliberat[ing]. You have to send us a note."

Nayeri contends these comments were improper because instead of telling the jurors to keep an open mind in the face of opposing viewpoints, he essentially told them to stop deliberating and tell the judge if other jurors were unwilling to come around to their position. That strikes us as a strained interpretation of the prosecutor's remarks. Although the remarks were confusing in some respects, the prosecutor made it clear that differing views were acceptable and that it was very important for the jurors to be patient and listen to one another, regardless of the opinions they held about Nayeri's culpability. But if a juror was refusing to do that, then they should notify the judge. This admonition was consistent with the law and did not put undue pressure on the jury to convict Nayeri at any cost. (Cf. *People v. Barnwell* (2007) 41 Cal.4th 1038, 1055 [there is nothing improper about informing prospective jurors that the failure to deliberate is reportable misconduct].)

Moreover, to the extent the prosecutor's comments may have confused the jurors with regard to their deliberative duties, their instructions emphasized the parties' closing arguments were just that, arguments, and

47

that their verdict had to be based solely on the evidence presented at trial and the law on which they were instructed by the court. (CALCRIM Nos. 200, 220.) Because there is nothing in the record to suggest the jury failed to heed these instructions, we presume the jury followed them in reaching its verdict. (*United States v. Runyon, supra,* 707 F.3d at p. 497; *People v. Avila* (2006) 38 Cal.4th 491, 575; *People v. Thompson* (2022) 83 Cal.App.5th 69, 96.)

That presumption is further bolstered by the jury's split verdict. The fact the jury did not convict Nayeri of all of the charges indicates that it was not improperly pressured by anything the prosecutor said in his closing argument. (See *People v. Chatman, supra,* 38 Cal.4th at p. 370 [the jury's partial acquittal of the defendant showed it had considered the evidence fairly and dispassionately in reaching its verdict]; *People v. Williams, supra,* 218 Cal.App.4th at p. 1073 [jury's partial acquittal of the defendant was "a strong indication that the jury remained objective despite any disparaging remarks by the prosecutor or arguments which appealed to racial sensitivities"].)

## H.  PowerPoint Presentation

Nayeri raises two claims regarding the PowerPoint slides the prosecutor used during his closing argument. The first claim is substantive in nature; it relates to what was actually shown on the slides. The second claim is procedural in nature; it relates to Nayeri's ability to challenge what may have been shown on the slides.

### 1. Substantive Claim

Nayeri's substantive claim is focused on a PowerPoint slide that shows him being handcuffed by the police, along with a caption that says, "Captured."[9] Although the slide accurately depicts what happened to Nayeri after he was arrested in the Czech Republic and returned to the United States for trial, Nayeri contends the slide undermined the presumption of innocence by drawing attention to his custodial status during the trial.

However, as we discussed above, Nayeri admitted during his testimony that he escaped from jail prior to trial. Therefore, irrespective of the slide showing him being handcuffed and captured, the jury would have known he was in custody during the trial. Under these circumstances, the slide was not improper or prejudicial. (Compare *Spence v. State* (Del. 2015) 129 A.3d 212, 220-224 [condemning the prosecutor's use of a PowerPoint slide that contained inflammatory photos and highly provocative wording].)

### 2. Procedural Claim

Nayeri's procedural claim is more complicated. It focuses on whether the PowerPoint presentation that was certified by the trial court as authentic is the one that the prosecutor actually used during his closing argument.

During the trial, the court ordered both sides to lodge the PowerPoint presentations they used during their closing arguments. In response to Nayeri's motion to augment the record, we ordered the superior court clerk to prepare a supplemental transcript that includes a printed copy

---

[9] In addition to using this slide during his closing argument, the prosecutor apparently displayed it in conjunction with the testimony describing Nayeri's extradition process.

of the prosecutor's PowerPoint presentation, but the clerk informed us she was unable to do that because the presentation was never filed in the trial court. Therefore, we directed the trial court to settle the record regarding the presentation.

At the settlement hearing, the prosecutor told the trial judge that he had retired from the county after Nayeri's case was over, and therefore, he no longer had access to all of the information and equipment that he used during the trial. Nevertheless, he was able to track down what he believed to be an accurate version of the PowerPoint presentation that he had used during his closing argument. That presentation contains roughly 150 slides. After the prosecutor submitted a written copy of the presentation to the court, the judge authenticated it as accurate, and the appellate record was supplemented to include the same.

However, because appellate counsel never received notice of the settlement hearing, we struck the PowerPoint presentation from the record and ordered the trial judge to conduct a new hearing on the matter. At that hearing, the prosecutor said the presentation contained in the stricken supplemental transcript was the latest version of the presentation he could find. And although he made several modifications to the presentation during the course of the trial, he believed that version was the one he had used in closing argument.

In response, Nayeri's appellate attorney pointed out that a few of the slides depicted in the supplemental transcript were different than they appeared in video footage of closing argument that was captured by a media outlet that had covered the trial. The prosecutor did not dispute that, nor did he offer any explanation for it. Nevertheless, the trial judge certified the supplemental transcript as being an accurate representation of the

50

prosecutor's PowerPoint slides. That effectively reinstated the supplemental transcript as part of the record of appeal.

Nayeri asks us to strike the supplemental transcript once again, on the basis it does not accurately reflect the slides the prosecutor actually used during his closing argument. (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 585 [the purpose of a settled statement is "to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court"].) Respondent has not opposed this request. In fact, respondent candidly admits the parties were unable to reproduce a true copy of the prosecutor's PowerPoint presentation as part of the settlement proceedings because that presentation has been lost. We therefore grant Nayeri's request to strike the presentation from the record.[10]

That brings us to Nayeri's next point. He contends that without an accurate copy of the prosecutor's PowerPoint presentation, meaningful appellate review is precluded because no one knows what was actually in the presentation. Based on the possibility that the presentation *could* provide grounds for reversal, he submits reversal is required on due process grounds. (See generally *People v. Taylor* (2010) 48 Cal.4th 574, 660 [due process requires the defendant to be afforded a record that allows adequate and effective appellate review].)

However, during closing argument, defense counsel did not object to any of the slides the prosecutor used during his presentation. And during the settlement process, appellate counsel identified only a handful of discrepancies between the slides offered by the prosecutor and the ones

---

[10] In light of this ruling, we deny as moot Nayeri's request to augment the record with information to prove the presentation is inaccurate.

shown in the video footage of his closing argument. At no point did counsel explain how those discrepancies might have been material to the case, nor did he argue they undermined Nayeri's fair trial rights.

While Nayeri claims an accurate copy of the presentation *may* reveal other discrepancies that *could* supply a basis for reversal, that is pure speculation. Those possibilities are not enough to establish a prejudicial infringement of Nayeri's right to prosecute his appeal. (See *People v. Young* (2005) 34 Cal.4th 1149, 1170 [record was sufficient to pursue meaningful appellate review even though it was missing some of the jury selection proceedings, bench conferences involving the jury instructions and other matters, and a conversation between the trial court and the jury foreperson]; *People v. Pinholster* (1992) 1 Cal.4th 865, 919–923 [holding similarly although the appellate record was missing 133 side conferences that occurred during trial, and efforts to settle the record were dissatisfactory to the defendant], disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405.)

## II.

### TRIAL COURT RULINGS

In addition to challenging the prosecutor's conduct in this case, Nayeri also takes issue with various rulings the trial court made throughout the trial. The rulings encompass a broad array of issues, ranging from courtroom security, to jury instructions, to the post-verdict proceedings.

A. *Security Measures in the Courtroom*

Although not required by any rule or statute, many trial court judges have developed practices that are designed to instill respect for the proceedings over which they preside. This case illustrates that, despite being well-intended, these practices must be administered carefully so as not to

undermine the appearance of fairness that is so essential to our criminal justice system.

1. Factual Background

At the beginning of each day of Nayeri's trial, the bailiff commenced the proceedings by reciting the following announcement in the courtroom: "Everyone please rise. In the presence of the flag of our country, emblem of the constitution, and remembering the principles for which it stands, the Superior Court of the State of California, in and for the County of Orange, is now in session. The Honorable Gregg L. Prickett, Judge Presiding. Please be seated and come to order." During the vast majority of the trial, Nayeri was allowed to stand and face the flag, along with the jurors and everyone else in the courtroom, when this announcement was made. At no point was he subjected to any physical restraints in front of the jury.

However, for security reasons, Nayeri was not allowed to stand in response to the bailiff's announcement while he was on the witness stand. Even though all of the other witnesses were allowed to stand for the announcement during their testimony, the judge warned Nayeri outside the presence of the jury that if he did try to stand up, he would be tackled immediately by the bailiffs who were seated behind him.

At the start of Nayeri's second day of testimony, before the jury entered the courtroom, defense counsel asked the judge if Nayeri could stand up when the bailiff made his morning announcement. The judge said no. He then asked defense counsel if he would like him to make a record of that issue for purposes of future review. The judge was prepared to make factual findings regarding Nayeri's escape from jail and how that created the need for extra security measures in the courtroom. However, defense counsel said that would not be necessary.

53

Because the witness box is located directly in front of the American flag, the jurors could not help but see that Nayeri was not standing when they stood to face the flag. According to Nayeri, the jurors initially looked at him with curiosity when he did not stand. However, their expressions soon turned to anger, scorn, and disgust because they felt he was being disrespectful by remaining seated. At least that is how Nayeri interpreted the situation.

On the third day of Nayeri's testimony, prior to the bailiff's morning announcement, defense counsel asked the trial judge if he would be willing to explain to the jury that Nayeri was staying seated pursuant to the court's order, not out of disrespect. In discussing the request, the judge asked defense counsel if he wanted the court to tell the jury why Nayeri was not being allowed to stand. Counsel did not want that; he simply wanted the jury to understand that it was the judge's decision for Nayeri to remain seated. However, the judge refused to inform the jury of that fact.

These background facts were established during a settled statement hearing that was conducted in conjunction with this appeal. At the hearing, the judge also noted that the witness box from which Nayeri testified is located only a few feet from his bench and the jury box. In addition, there is a side door marked with an exit sign about eight feet from the witness box. If one were to take that side door out into the hallway, they would be roughly 25 feet away from an exit door to the general public.

In his motion for a new trial, Nayeri argued the trial court violated his due process rights by not allowing him to stand for the bailiff's morning announcement while he was on the witness stand, and by refusing to inform the jury that he had been ordered to remain seated by the court. The court did not see it that way. It ruled, "The defense never objected to

[the] procedure [requiring Nayeri to remain seated], and hence the issue is waived. The defense also never requested the jury be admonished, and any potential prejudice could have easily been cured by such an admonition." In any event, the court found that requiring Nayeri to remain seated did not infringe his right to a fair trial.

2. Analysis

Nayeri renews his due process argument on appeal. As explained above, the record shows Nayeri did in fact object to not being allowed to stand for the bailiff's morning announcement, and defense counsel did in fact ask the court to inform the jury that it was the court's decision to have Nayeri remain seated. Therefore, the issue has not been forfeited on appeal.

On the merits, it is well established that trial judges have broad authority to maintain security in their courtrooms. (*People v. Lomax* (2010) 49 Cal.4th 530, 558.) And given the nature of the charges against Nayeri, as well as his demonstrated escape and flight history, the trial court was fully justified in believing he posed a potential security threat to everyone in the courtroom. (*People v. Valenzuela* (1984) 151 Cal.App.3d 180, 192 [escape efforts may justify security measures].) But "even when the record in an individual case establishes that it is appropriate to impose some restraint upon the defendant as a security measure, a trial court properly must authorize the least obtrusive or restrictive restraint that effectively will serve the specified security purposes." (*People v. Mar* (2002) 28 Cal.4th 1201, 1226.) In other words, to the extent it is reasonably feasible to do so, the court's security measures must be designed to minimize any resulting prejudice to the defendant.

Here, the trial judge could have lessened the potential prejudice to Nayeri by instructing the jury that it was his decision to have Nayeri

remain seated during the bailiff's morning announcement when he was on the witness stand. That would have negated any impression that Nayeri was being disrespectful by staying seated.

Although defense counsel requested such an instruction, the trial judge apparently believed that if he told the jury Nayeri was not allowed to stand, he would have had to explain *why* that was, which would have exposed the jury to prejudicial information about Nayeri's jail escape. However, that is not the case. All the trial judge had to do was to tell the jury: 1) If given the choice, Nayeri would prefer to stand up during the bailiff's morning announcement, 2) but the judge had a standard policy of not allowing any criminal defendant to stand up while they were on the witness stand, 3) this standard policy had nothing to do with Nayeri personally, and 4) the jury was not allowed to draw any negative inferences from the fact that Nayeri remained seated during the announcement. In all likelihood, an admonition along these lines would have stemmed the tide of disapproving stares that Nayeri allegedly received by remaining seated during the announcement.

Still, we do not believe it is reasonably probable Nayeri would have received a more favorable result at trial if the judge had informed the jury that it was his decision to have Nayeri remain seated. Based on Nayeri's own testimony, the jurors knew that he had escaped from jail prior to trial and thus posed a heightened security risk in the courtroom. They also would have understood that risk justified treating Nayeri differently from other witnesses who testified at the trial, in terms of what he was allowed to do in the courtroom. We do not believe this differential treatment was likely to cause the jury to convict Nayeri out of blind passion, as opposed to reasoned judgment.

Our view of this issue might be different if the trial judge had *never* allowed Nayeri to stand during the bailiff's morning announcement. However, Nayeri was only ordered not to stand during the few days he was on the witness stand. For the remainder of the month-long trial, he was allowed to, and did in fact, stand up whenever the bailiff recited his morning announcement. Thus, contrary to Nayeri's belief, it is unlikely the jury perceived him as an anti-American "Islamist" who remained seated for political reasons. The remoteness of this possibility leads us to the conclusion that any error in ordering Nayeri not to stand for the flag during his testimony was of a harmless nature. Therefore, it does not warrant a new trial in this matter.

### B. *Admissibility of Voicemail Message*

Nayeri claims the trial court erred in allowing the prosecution to admit into evidence a threatening voicemail message that he left for Shegerian after he fled to Iran. We conclude the trial court did not error in admitting the message.

#### 1. Factual Background

On direct examination, Nayeri testified that at one point during his marriage to Shegerian, he was ordered to attend domestic violence classes for physically abusing her. Nayeri said the classes taught him how to cope with his anger and to communicate with Shegerian in a more positive manner. In attempting to prove otherwise, the prosecutor asked Nayeri on cross-examination about a threatening message he left for Shegerian while he was in Iran, after his alleged crimes occurred. Particularly, the prosecutor wanted to know if Nayeri left a message on Shegerian's voicemail saying something to the effect of, "Answer the f'ing phone. I'll take you down," bitch. After defense counsel's objection to the question was overruled, Nayeri

admitted it was very possible that he had left such a message for Shegerian. Later, during closing argument, the prosecutor alluded to the message as proof that Nayeri did not learn anything from the domestic violence classes he had attended.

2. Analysis

As he did in the trial court, Nayeri contends his threatening statement in the voicemail message should have been excluded on spousal privilege grounds, pursuant to Evidence Code section 980. However, that section applies only if the statement in question was made "in confidence" between the speaker and his or her spouse. (*Ibid*.) "'To make a communication "'in confidence,'" one must intend nondisclosure [citations], and have a reasonable expectation of privacy'" in the communication. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 420.)

Nayeri presumably intended nondisclosure when he threatened to take down Shegerian in the voicemail message. However, considering that Nayeri had previously been arrested for committing domestic violence against Shegerian, he did not have a reasonable expectation the message would remain private. That earlier incident demonstrated that Shegerian was not afraid to report Nayeri's abusive behavior to the police. Given her past willingness to do so, Nayeri could not have reasonably expected her to keep his threatening voicemail message to herself. (*People v. Bryant, Smith and Wheeler, supra,* 60 Cal.4th at p. 420 [because the defendant's statement to his wife constituted a direct and violent threat, "any expectation of confidentiality would have been unreasonable"]; *People v. Carter* (1973) 34 Cal.App.3d 748, 752–753 [same]; see generally *United States v. White* (9th Cir. 1992) 974 F.2d 1135, 1138 [protecting threats against a spouse is inconsistent with the purpose of the marital communications privilege, which

58

is to foster marital harmony].) Therefore, the message was not barred by the spousal privilege.

Moreover, assuming otherwise, the admission of Nayeri's voicemail message was surely harmless. Shegerian testified that Nayeri had a dark and volatile side to him, and that aspect of Nayeri's personality was on full display when he was arrested for abusing Shegerian during their marriage. The likelihood the jury convicted Nayeri of some counts but not others due to one short voicemail message is so remote as to render any error in its admission patently harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [evidentiary errors under state law do not warrant reversal unless it is reasonably probable they affected the outcome of the case].)

C.  *Aggravated Kidnapping Instruction*

Nayeri contends the trial court committed prejudicial error by instructing the jury on an invalid theory of aggravated kidnapping. Respondent concedes instructional error occurred, but maintains it was harmless under the circumstances. We agree with respondent that the error is not cause for reversal.

In counts 1 and 2, Nayeri was charged with aggravated kidnapping pursuant to section 209, subdivision (a). That provision provides, "A person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away another person by any means whatsoever with the intent to hold or detain, or who holds or detains, that person for ransom, reward, or to commit extortion or to exact from another person any money or valuable thing, or a person who aids and abets any such act, is guilty of a felony." (§ 209, subd. (a), hereafter § 209(a).)

The reason this offense is called aggravated kidnapping is that, unlike simple kidnapping, which is a general intent offense that arises

59

independently of any other criminal objective, aggravated kidnapping is committed for a specific purpose, such as obtaining ransom money. (*People v. Bell* (2009) 179 Cal.App.4th 428, 435, fn. 2.) In this case, the trial court instructed the jury that the purpose element required proof Nayeri kidnapped the victims "for ransom or to commit extortion[,] or to get money or something valuable." However, the court's instructions failed to explain a distinction between the first two purposes and the third purpose.

Under the terms of section 209(a), ransom and extortion do not require a secondary victim, meaning the crime is elevated to aggravated kidnapping even if the victim of the kidnapping is the subject of the ransom or extortion demand. (*People v. Stringer* (2019) 41 Cal.App.5th 974, 981–982.) However, if the kidnapping is designed to get money or something of value, the defendant must intend to get the money or valuable *from another person*. (*Id*. at p. 982.) The trial court's instruction failed to explain this distinction to the jury. Consequently, one of the theories needed to satisfy the intent requirement for aggravated kidnapping was flawed. It impermissibly allowed the jury to convict Nayeri of that offense even "if he sought to exact money or property *from the kidnap victims*" themselves. (*Id*. at p. 983.)[11]

"This type of instructional error, where the jury is instructed with one [or more] correct theor[ies] of guilt and one incorrect theory of guilty, is known as 'alternative-theory error.' [Citation.]" (*People v. Stringer, supra*,

---

[11] Because trial courts have a sua sponte duty to correctly instruct the jury on all of the essential elements of a charged offense, Nayeri did not forfeit his right to challenge this instruction on appeal by failing to object to it in the trial court. (See *People v. Merritt* (2017) 2 Cal.5th 819, 824; *People v. Mil* (2012) 53 Cal.4th 400, 409; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

41 Cal.App.5th at p. 984.) "[W]e review alternative-theory errors under the *Chapman v. California* (1967) 386 U.S. 18 . . . standard governing federal constitutional errors. [Citations.] Under that standard, we 'must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt. [Citation.]" (*Stringer, supra,* 41 Cal.App.5th at p. 984.)

Although that is a demanding standard, it may be satisfied when the record contains overwhelming evidence to support a valid theory of guilt. (*In re Lopez* (2023) 14 Cal.5th 562, 568.) The pertinent question is whether, based on the entire record, "any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well. [Citation.]" (*Ibid.*) If so, "the error is harmless because the presentation of the invalid theory to the jury made no difference. The error did not contribute to the verdict. [Citations.]" (*Id.* at p. 589.)

In this case, the defense admitted all of the alleged crimes were proven beyond a reasonable doubt. Because the only disputed issue was Nayeri's involvement in those crimes, it is exceedingly unlikely the invalid theory of aggravated kidnapping had any bearing on the jury's verdict. (Cf. *People v. Merritt, supra,* 2 Cal.5th at p. 832 [failing to instruct on all of the elements of the charged offense deemed harmless where defendant conceded those elements were proven].)

Despite this, Nayeri contends the evidence pertaining to the valid theory of kidnapping for extortion was not so overwhelming as to render the

61

invalid theory harmless beyond a reasonable doubt.[12] Nayeri argues the extortion theory was inapt for a variety of reasons. First, extortion requires the victim to consent to handing over money or property as a result of the defendant's threats or use of force. (§ 518; CALCRIM No. 1830.) Because Michael never handed over anything to his kidnappers, let alone the million dollars they were seeking, Nayeri contends the jury would not have convicted him on this theory. However, while the crime of extortion requires proof the defendant consented to turning over something of value, Nayeri was not charged with that offense. Instead, he was charged with kidnapping to commit extortion. Unlike the completed crime of extortion, that offense merely requires the intent to kidnap for the purpose of extortion, it does not require proof the crime of extortion was committed. (See *People v. Anderson* (1979) 97 Cal.App.3d 419, 425.) Therefore, it is immaterial that the kidnappers did not actually obtain the money they were seeking from Michael.

Second, Nayeri contends the kidnappers intended to rob Michael, not extort him. "Extortion is the obtaining of property or other consideration from another, with his or her consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right." (§ 518.) The only difference between that offense and robbery is that the victim "consents" to the taking in extortion, albeit due to force or

---

[12] Although Nayeri does not dispute the trial court's kidnapping instructions were legally correct with respect to both the extortion theory and the ransom theory, he contends the ransom theory was factually inapt, and respondent does not argue otherwise. Therefore, like the parties, we will focus our harmless error analysis on the kidnapping for extortion theory.

fear. (See § 211; 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, § 103, p. 136.)

Nayeri contends the kidnappers intended to take Michael's money without his consent, as part of a robbery scheme. However, because the kidnappers had no idea where the alleged million dollars was, they needed Michael's cooperation to locate the money. That is why they tortured him repeatedly inside the van; they were hoping he would "consent" to turning over the money by telling them where it was buried. This smacks of an attempt to commit extortion, not robbery. (Compare *Stringer, supra*, 41 Cal.App.5th at p. 985 [no basis for extortion theory where defendant kidnapped victims for a purpose other than to take their property by consent].)

Third, Nayeri claims the extortion theory was inapt because the kidnappers never threatened to reveal some dark secret about Michael if he failed to tell them where the million dollars was located. However, while the crime of extortion is commonly understood to require such threats, a blackmail demand is not required under California's extortion statute. Rather, as set forth above, the statute merely requires proof the victim was subjected to the wrongful use of force or fear, which Michael clearly was. (§ 518.) As such, it is immaterial that he was not blackmailed by his captors.

Lastly, Nayeri claims the extortion theory was implausible because the kidnappers rejected Michael's offers to give them $100,000 or some lesser sum of money. Nayeri sees this as proof the kidnappers were not trying to extort money from Michael but merely looking for an excuse to do him harm. However, the kidnappers did not reject Michael's smaller offers because they did not want his money; they turned down the smaller offers because they thought they could get *more* money from him, a million dollars

to be precise. And while it is true the kidnappers eventually gave up on the million dollars and turned their intentions toward sexually mutilating Michael, that was only because they did not get the grand prize they were looking for. Because the kidnapping was clearly motivated by a craven desire to get Michael's money, the extortion theory fit the facts to a tee.

Given the strength of the evidence as to that theory of aggravated kidnapping, the presence of an invalid theory is not cause for reversal. We are convinced beyond a reasonable doubt that any rational juror who may have found Nayeri guilty of aggravated kidnapping based on the invalid theory that he wanted to get money from Michael (as opposed to a third person) would necessarily have found him guilty of that offense based on the valid theory that he wanted to extort money from Michael. As such, inclusion of the invalid theory does not warrant a reversal of his convictions for aggravated kidnapping. (*In re Lopez, supra*, 14 Cal.5th at p. 589.)

D. *Accomplice Instructions*

Nayeri asserts the trial court's instructions on accomplice testimony and prior statements impermissibly allowed the jury to consider Shegerian's pretrial statements in determining whether her testimony was sufficiently corroborated. Giving the instructions their plain and ordinary meaning, we do not think they combined to undermine Nayeri's right to a fair trial.[13]

Pursuant to CALCRIM No. 335, the jurors were instructed, "If the crimes charged were committed, then [Shegerian was an] accomplice[] to

---

[13] Respondent argues Nayeri forfeited this claim by not raising it in the trial court, but to the extent the instructions in question affected Nayeri's substantial rights, no objection was required. (§ 1259.)

those crimes. You may not convict the defendant of any crime based on the statement or testimony of an accomplice alone. You may use the statements or testimony of an accomplice to convict the defendant only if: [¶] One, the accomplice's statements or testimony is supported by other evidence that you believe; [¶] Two, the supporting evidence is independent of the accomplice's statement or testimony; [¶] And three, the supporting evidence tends to connect the defendant to the commission of the crime."

The court also gave CALCRIM No. 318, which told the jurors, "You have heard evidence of statements that a witness made before trial. If you decide the witness made those statements, you may use those statements in two ways: [¶] One, to evaluate whether the witness's testimony in court is believable; [¶] And two, as evidence that the information in those earlier statements [is] true."

Nayeri does not dispute the correctness of these instructions, in and of themselves. Instead, he argues CALCRIM No. 318 undermined the corroboration requirement set forth in CALCRIM No. 335 by effectively allowing the jury to use Shegerian's own pretrial statements to corroborate her trial testimony.

However, while CALCRIM No. 318 allowed the jury to consider Shegerian's pretrial statements for purposes of assessing the credibility of her trial testimony, CALCRIM No. 335 made it clear those statements could not be used for purposes of determining whether her testimony was sufficiently corroborated to be used against Nayeri. In that regard, "CALCRIM No. 335 instructed the jury to require supporting testimony that was independent of [Shegerian's] statement[s] or testimony. The instruction's use of the word 'independent' to describe the sort of evidence that could serve as corroboration eviscerates [Nayeri's] claim that the instruction allowed

65

[Shegerian] to corroborate [her] own testimony." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 365; *People v. Mackey* (2015) 233 Cal.App.4th 32, 116–117.)

*E. Jury Coercion*

During deliberations, the jury sent the trial judge a series of notes indicating it was having trouble arriving at a unanimous verdict on all of the charges. Nayeri contends the judge's responses to those notes coerced the jury into reaching a guilty verdict, but we are not persuaded.

1. Factual Background

The jury began its deliberations on Monday, August 12th, 2019. The following day, it asked for a copy of the written proffer that Shegerian made to the police after she decided to cooperate with the authorities. But because the proffer was never admitted into evidence, the court denied the request. The jury also asked for a readback of a detective's testimony, which was provided.

As the jury was departing for its evening recess, one of the jurors approached the bailiff in the hallway. The juror was emotional and indicated she was having a difficult time during deliberations because she was not in agreement with the other jurors about how the case should be decided. She wanted to keep talking to the bailiff, but the bailiff told her she should not be discussing deliberations with him and promptly ended the conversation.

The next morning, Wednesday, August 14th, the bailiff reported the incident to the trial judge. The judge also received a note from the jury that read, "We [need] help . . . because we have one juror who has a different view than the other 11 jurors. It appears that her view of 'reasonable conclusions' is different than the others."

In response to these events, the judge met with counsel and informed them that he was inclined to read the jury CALCRIM No. 3551,

which applies when the jury is unable to reach a verdict. Defense counsel expressed concern that giving that instruction would make the holdout juror feel like she had done something wrong. He wanted the judge to talk to the holdout juror to ensure she was not being unduly pressured by the other jurors. He also asked the judge to poll the jurors to find out if any of them believed they could actually reach a verdict. However, the prosecutor argued that polling the jury would have a chilling effect on deliberations. He simply wanted the judge to read CALCRIM No. 3551 to the jurors and to leave it at that.

Ultimately, that is what the judge decided to do. Per CALCRIM No. 3551, he told the jury, "Sometimes jurors that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict on one or more counts. [¶] Please consider the following suggestions: [¶] Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form . . . your own individual opinion after you have fully and completely considered all the evidence with your fellow jurors.

"It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the defendant are entitled to [the] individual judgment of each juror. [¶] It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. [¶] Let me know whether I can do anything to help you further, such as give additional instructions, or clarify instructions I have already given." (CALCRIM No. 3551, as given.)

67

The judge also reminded the jurors to treat each other courteously before sending them back to resume their deliberations.

An hour later, the jury sent the judge two more notes. The first one stated, "A juror has been drawing conclusions from other possible explanations/doubts instead of only on circumstantial evidence. What should we do?" The second note asked, "If we have a juror who wants to be excused as a juror due to frustration over our deliberation[s], what will happen to the rest of the jurors? Will there be a new jury to deliberate on this trial?" The jury followed up that question with a third note that asked, "Will the final count be made public? Like if we end up 11–1 on a hung jury."

In response to the first note, which suggested a juror was drawing unreasonable inferences from the evidence, the judge told the jury, "A juror should consider 'evidence' as defined in CALCRIM [Nos.] 222, 223, and 302. [¶] As to circumstantial evidence, consider CALCRIM [Nos.] 224 and 225. [¶] Consider these instructions, along with all the other instructions, in reaching a verdict."

Regarding the second note, the judge told the jury, "A deliberating juror can only be excused upon a proper showing to the court." And as to the third question, about whether the verdict would be made public, the court simply answered, "Yes." After that, the jury deliberated for another 90 minutes before retiring for the evening.

The following day, Thursday, the 15th of August, the jurors sent the judge several more notes during the course of their deliberations. The first note asked, "If we don't come to a consensus of all 12 jurors, how do we use the verdict forms that we have right now? Do we need new ones? [¶] Do we have to provide a jury count for each of the charges and 'sub-charges'? [¶] We are trying to follow the judge's instructions from yesterday to do

everything possible to gain consensus from all jurors but we're feeling that we won't be able to. We would like to be able to weigh in on all counts."

The second note asked, "On counts 1, 2, 4 – do we have to vote the same on the first and second parts of the count? For example: If one juror votes not guilty on the first part, do they have to vote 'not true' on the second part [ ] in order to be consistent[?]"

The third note asked, "How would you like the jury to proceed in a situation where one (or more) jurors 1) does not exhibit basic, sound LOGICAL thinking and/or 2) displays significant INCONSISTENT standards of assigning credibility (possibly implying a 'bias') [and is] not applying the same standard for each witness." (Original caps and parens.)

The fourth note asked, "What is the consequence if a juror does not follow the jury instruction of refraining from coming up with a verdict until AFTER jury deliberation is completed? This concern is in response to a juror PREMATURELY asking how long we should consider deliberation to continue, stating that they don't think there will be anything that could change their mind, although 1) there was a lot of evidence still left to be discussed/considered and 2) the jury was still discussing the first (of several) counts. Further concern comes from hearing the juror's response in questioning why it is even important WHEN (at what point) they had come to their verdict. It is my understanding that jurors should not 'make up [their] mind' on the verdict until after all the evidence is discussed/reviewed." (Original caps, parens, and bracket.)

The fifth note asked for a readback of the testimony of Police Investigator Don Gage, who testified to the search of Handley's truck.

The sixth noted stated, "Juror A believes that juror B is not following the jury instructions because juror B wants 100% certainty for a

69

guilty vote, but only a 1% certainty for a non-guilty vote. Further, juror B lets 'what if' scenarios keep that juror from 100% certainty and does not evaluate the doubt based evidence: is there evidence to trigger that doubt? When there is no evidence to trigger such doubt, juror proceeds to conjure up another doubt. This is a cycle/pattern and juror A believes at this point, it is obstruction of justice. May juror A ask[ ] to excuse juror B, or excuse juror A, or both be excused and replaced with alternates?"

When the trial judge met with the attorneys to discuss these notes, defense counsel again suggested polling the jurors to find out if they believed further deliberations would be fruitful. However, the judge felt it was still too soon to do that. He also put on the record that, unlike in some of the other trials he had presided over, he had not heard any loud voices coming from the jury room while the jury was conducting its deliberations.

The judge did contemplate allowing the parties to present additional closing arguments, so they could address some of the jurors' stated concerns. But, instead of doing that, the judge decided to reread CALCRIM No. 3550 to the jury. That instructions states:

"It is your duty to talk with one another and to deliberate in the jury room. You should try and agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. [¶] Do not hesitate to change your mind if you become convinced you are wrong. But do not change your mind just because other jurors disagree with you. [¶] Keep an open mind and openly exchange your thoughts and ideas about this case. [¶] Stating your opinions too strongly at the beginning or immediately announcing how you planned to vote may interfere with an open discussion. [¶] Again, please treat one another

70

courteously. [¶] Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other."

The court also reminded the jurors that their verdict required unanimity: "In other words, if all of you do not agree on something, you do not have a verdict." And, "[i]f there [are] two parts to your finding and you do not have a unanimous verdict as to the first part, you would not go to the second part."

After that, the judge reread the instructions on evidence, the difference between direct and circumstantial evidence, accomplice testimony, and reasonable doubt. (CALCRIM Nos. 220, 222, 223, 224, 335.) The judge then gave the jury the choice of taking the rest of the day off or resuming its deliberations. The jury chose to resume deliberations, and roughly two hours later, at 4:30 p.m., it announced it had reached a verdict on three of the four counts. At that point, the judge adjourned the proceedings for the evening and instructed the jury to return in the morning for further deliberations on the remaining count.

The next morning, Friday, the 16th of August, the jurors deliberated 22 more minutes before informing the judge that they were unable to reach a verdict on the remaining count, which encompassed the mayhem charge. When the judge asked if there was anything he could do to assist the jury in that regard, the foreperson answered, "No, sir. We tried everything under the sun." The judge then asked the rest of the jurors if any of them disagreed with that assessment, and none of them raised their hand or signaled any disagreement with the foreperson's take on the situation. After the verdict was revealed, the judge had his clerk poll each of the jurors by asking them if the verdict reflected their own personal opinion about the case. All 12 of them answered yes.

71

2. Analysis

Nayeri argues the judge exerted undue pressure on the holdout juror to conform her verdict to the majority by giving CALCRIM No. 3551, rereading CALCRIM No. 3550, and refusing to poll the jurors to see if they believed they could reach a verdict. The Attorney General not only disagrees, he also raises the prospect of forfeiture. However, the record shows defense counsel wanted the judge to poll the jury instead of giving them further instructions in response to their questions, and that the court gave CALCRIM No. 3551 and reread CALCRIM No. 3550 over the objection of the defense. Therefore, we will address Nayeri's claims on the merits.

Our analysis is guided by section 1140, which states, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless [the parties consent], *or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."* (Italics added.)

For purposes of this provision, "'The determination whether there is a reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' [Citation.] The question of coercion is necessarily dependent on the facts and circumstances of each case. [Citation.]" (*People v. Sandoval* (1992) 4 Cal.4th 155, 195–196.)

Relying on *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), Nayeri asserts the trial court handled the jury's notes in a manner that was likely to have a coercive effect on the holdout juror because she was outnumbered

72

11 to 1 and was experiencing pressure from the majority to change her mind. In *Gainer*, though, the Supreme Court was concerned with judicial statements that encourage jurors to decide the case based on irrelevant considerations, such as the numerical division of the jury or the expense and inconvenience of retrial if they are unable to reach a verdict. (*Id.* at p. 852.) The trial judge made no such statements here.

Nor did the judge pressure any of the jurors to abandon their independent judgment and change their position simply because it was not shared by the majority of the jurors. (See *Gainer, supra,* 19 Cal.3d at pp. 849–850.) To the contrary, the judge instructed the jurors per CALCRIM No. 3551 *not* to change their position just because it differs from that of the other jurors, because both parties were entitled to the individual judgment of each juror. The same message was imparted through CALCRIM No. 3550. That instruction also told the jurors to "try and agree on a verdict *if you can.*" (Italics added.) This precatory wording signaled a verdict was desired but not required.

Taken as a whole, the court's instructions ensured that Nayeri received the independent consideration and judgment of each and every juror. They did not coerce the jury into reaching its verdict. (*People v. Santiago* (2009) 178 Cal.App.4th 1471, 1476 [CALCRIM No. 3550 "does not improperly direct a deadlocked jury that it is required to reach a verdict"]; *People v. Whaley* (2007) 152 Cal.App.4th 968, 984 [giving CALCRIM No. 3551 "did not implicitly approve a movement toward unanimity or otherwise send a message that the holdout juror was to cooperate with the majority"]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1121 [in giving CALCRIM No. 3551, the trial court exercised its power without compelling the jurors to surrender

their independent judgment in favor of compromise or expediency].) As such, the instructions were not improper.

Nayeri also complains the trial court never polled the jurors to find out if they believed further deliberations would be fruitful. However, a "trial court does not abuse its discretion merely by declining to poll the jury as to the likelihood of reaching a unanimous verdict." (*People v. Peoples* (2016) 62 Cal.4th 718, 782; see, e.g., *People v. Proctor* (1992) 4 Cal.4th 499, 539; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1121–1122.) Even if the jury had been polled and reported negative on the prospects for a unanimous verdict at that time, it still would not have been unreasonable for the trial judge to have them continue deliberating. (See *People v. Sandoval, supra,* 4 Cal.4th at pp. 194–197; *People v. Rodriguez* (1986) 42 Cal.3d 730, 765–770.) After all, they had only been deliberating for two days when they first reported having issues with deliberations. That is not a particularly long time for a month-long trial.

Nayeri further faults the trial judge for not answering the jury's question about what would happen if deliberations broke down due to frustrations in the jury room. However, defense counsel did not propose any answers to that question, and the trial judge was wise to steer clear of it because it alluded to the prospect of a retrial. That topic is best avoided when the jury is struggling to reach a verdict because it could lead the jurors to abandon their independent judgment and decide the case based on considerations that are wholly irrelevant to the defendant's guilt or innocence. (See *People v. Gainer, supra*, 19 Cal.3d at p. 852, fn. 16.)

All things considered, we do not believe the trial judge's acts or omissions improperly coerced the jury or put undue pressure on the holdout juror to conform her views to the majority position. In fact, we know from the

74

jury's hung verdict on one of the charges that she *did not* do this, which is a strong indicator the deliberations were not tainted by anything the trial judge did or did not say. (See *United States v. Ailsworth* (10th Cir. 1998) 138 F.3d 843, 852 [the jury's inability to reach a unanimous verdict on some of the counts demonstrates it "'was not compelled or coerced to reach a unanimous verdict'"]; *Perez v. Marshall* (9th Cir. 1997) 119 F.3d 1422, 1428 [same].) No cause for reversal has been shown.

*F. Request for Juror Contact Information*

Nayeri contends the trial court erred in denying his request to obtain the jurors' contact information. However, we discern no abuse of discretion in the court's decision to keep the jurors' contact information private.

1. Factual Background

The jury rendered its verdict in August 2019. However, Nayeri was not sentenced until over a year later, on October 30, 2020. One of the reasons for this delay was that Nayeri fired his retained attorney and a new attorney, Renee Garcia, was appointed in his stead. Following Garcia's appointment on January 17, 2020, she requested and received all of the transcripts associated with Nayeri's trial.

On June 11, 2020, Garcia filed a motion to disclose the jurors' contact information. The purpose of the motion was to develop a factual basis for a juror misconduct claim that Garcia intended to present in her motion for a new trial. In regard to that future claim, the disclosure motion not only referenced the various notes the jury had sent to the trial judge during its deliberations. It also brought up the fact that the jury foreperson had recently appeared on the television program 20/20 as part of a broadcast about Nayeri's trial. According to Garcia, the foreperson discussed her

75

frustration over deliberations on the program and said the reason it took the jury so long to reach a verdict is because one of the jurors initially believed that Nayeri was not guilty.

Based on all of these circumstances, Garcia surmised "[t]he conflict and frustration exhibited by the jury caused at least [that] one juror to change [her] vote out of fear and intimidation versus independent judgment." Garcia requested access to the jurors' contact information so she could investigate that issue.

The prosecution opposed the request for lack of good cause. It further argued the request violated Evidence Code section 1150, which bars evidence bearing on a juror's mental processes. And it raised a hearsay objection to any statements that were attributed to the jury foreperson in the motion. Finding the hearsay objection well taken, the trial court granted the defense leave to file declarations in support of its request to divulge the jurors' contact information.

Garcia responded with a declaration from defense investigator Thomas Gleim. Gleim declared that in speaking to the foreperson about the case, he learned there were now nine jurors who were willing to discuss the case with the media. The foreperson also told Gleim that, during deliberations, there was lots of yelling, anger, and insults directed toward the holdout juror, and at one point, things got so heated that the bailiff had to admonish them to quiet down.

According to Gleim, the foreperson also told him that she saw the holdout juror approach the bailiff after deliberations one day. The foreperson got the impression the holdout juror was "very emotional due to being yelled at and [ ] beat up by the other jurors." So, the foreperson took the holdout juror to dinner that evening, in an attempt to make her feel better. However,

the foreperson believed "this was *after* the verdicts were turned into the court," meaning after deliberations had already come to an end. During the dinner, they talked about how the holdout juror had been singled out during deliberations, but they tried not to talk about the case itself.

In his declaration, Gleim also alleged that he had spoken to Nayeri's trial attorney. Counsel told Gleim that when the jurors were polled individually following their verdict, the holdout juror hesitated before saying she agreed with the verdict. In light of this, counsel made an off-the-record request to have the judge poll each of the jurors to find out if there was any coercion or undue influence in the course of deliberations. However, the judge declined to do so.

In support of her disclosure motion, defense counsel Garcia also submitted copies of four online news articles about the case. The articles quote the foreperson as saying the reason the jury was unable to reach a verdict on the mayhem count is because one of the jurors had doubts about Shegerian's testimony and whether Nayeri was personally involved in the mutilation of Michael's genitals. In fact, the holdout juror did not believe Nayeri was guilty of any of the charged offenses.

In hearing the matter, the trial court agreed with the prosecution that there was still a potential hearsay problem with the disclosure request because Gleim's declaration contained statements that were attributed to the foreperson. As to that issue, Garcia informed the court that the foreperson was not willing to submit a declaration of her own, and other jurors had refused to speak to the defense, even though they had agreed to speak to the media. Garcia also took issue with the foreperson's recollection that she took the holdout juror to dinner *after* the jury had already returned its verdict.

Based on the timing of the jury's notes, Garcia argued it was more likely the dinner occurred *before* deliberations had been completed.

After taking the matter under submission, the trial court determined there was not a sufficient showing of possible juror misconduct to warrant disclosure of the jurors' contact information to the defense. The court reasoned that, although there was evidence to suggest the holdout juror had been pressured during deliberations, it did not rise to the level of undue coercion. Furthermore, based on the foreperson's stated belief that she took the holdout juror to dinner *after* the jury had returned its verdict, the court found that particular incident was insufficient to justify the release of the jurors' personal contact information.

2.  Analysis

Juror confidentiality is an important aspect of our criminal justice system. In order to protect juror privacy, once the verdict is recorded, "the trial court must seal the record of 'personal juror identifying information,' including 'names, addresses, and telephone numbers.' (Code Civ. Proc., § 237, subd. (a)(2).)" (*People v. Munoz* (2019) 31 Cal.App.5th 143, 165.) This information is subject to disclosure upon a showing of good cause, but "[t]his showing must "'support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial.'" [Citation.]" (*Ibid*.)

"'Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported.' [Citation.] "'Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of

78

the juror information.'" [Citation.] We review a trial court's denial of a petition for the release of juror information for abuse of discretion. [Citation.]" (*People v. Munoz, supra,* 31 Cal.App.5th at p. 165.)

No such abuse occurred in this case. In support of her disclosure request, defense counsel Garcia offered the foreperson's statements (as reflected in Gleim's declaration and various news articles) to help explain why the holdout juror ultimately joined the majority in voting to convict Nayeri on some of the counts. However, the reasoning behind a juror's decision-making process cannot be used to impugn a verdict. (See *People v. Peavey* (1981) 126 Cal.App.3d 44, 50–51 [the subjective considerations which influenced a juror's decision, such as their desire to go along with the other jurors, are inadmissible under Evidence Code section 1150].) Even the foreperson's subjective understanding that the holdout juror appeared to be emotionally distraught from the grief she allegedly received from other jurors was inadmissible, to the extent it was intended to reflect the holdout's subjective mental processes. (*People v. Keenan* (1988) 46 Cal.3d 478, 542.)

Nayeri contends the objective circumstances surrounding the deliberations—yelling, insults, etc.—proved the jurors were so hard on the holdout juror that an inference of misconduct can be inferred. But, the trial court noted on the record that it did not hear any loud noises coming from the jury room during the jury's deliberations. And to the extent there may have been some verbal clashing, we must remember that "'[j]urors may be expected to disagree during deliberations, even at times in heated fashion.'" (*People v. Keenan, supra*, 46 Cal.3d at p. 541.) "Virtually any juror whose views differ from those of others on the panel may feel 'somewhat coerced' or that the deliberations process is 'very difficult.'" (*People v. Jones* (2020) 50 Cal.App.5th

694, 703.) But, standing alone, that is insufficient to permit inquiry as to the validity of a verdict. (*People v. Keenan, supra*, 46 Cal.3d at pp. 541–542.)

In support of her petition, defense counsel Garcia also relied on the dinner that occurred between the foreperson and holdout jury. However, there is substantial evidence to support the trial judge's finding that the dinner did not take place until after the jury had already returned its verdict. Although the record is a bit murky on this issue, the foreperson recalled the verdict preceded the dinner, and we are not at liberty to second guess the trial judge's decision to credit her belief in that regard. (*People v. Nadey, supra,* 16 Cal.5th at p. 172; *People v Linton* (2013) 56 Cal.4th 1146, 1194.)

The foreperson also made it clear that the dinner was intended to provide emotional support for the holdout, not discuss the case. And although the foreperson was willing to talk to a defense investigator, she was reluctant to submit a declaration to the court, and other jurors on the case did not want to be contacted by the defense at all. On this record, we agree with the trial court that there was an insufficient showing to justify the release of the jurors' private contact information. No abuse of discretion or grounds for reversal have been shown.

## G. *Request for Self-Representation*

Nayeri contends the trial court erred in denying his request to act as his own attorney. However, the record fully supports the trial court's decision to deny the request as untimely.

### 1. Factual Background

This issue did not arise until October 2020, about a month after the trial court denied defense counsel's request to obtain the jurors' contact information. At that time, Nayeri first asked the trial court to appoint him a new attorney pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. The request

was primarily based on Nayeri's dissatisfaction with the new trial motion that Garcia had filed on his behalf, which was then pending before the court. Although that motion was nearly 100 pages long, Nayeri felt it did not adequately address all of the issues that he believed justified a new trial. But after hearing arguments on the matter, the trial judge determined Nayeri was receiving competent representation and denied his request for a new attorney.

At that point, Nayeri sought to represent himself, so he could file his own motion for a new trial. When the judge asked how much time he would need to do that, Nayeri said "as long as it would take me to do [the] motion." When pressed for a more definitive estimate, Nayeri was unable to provide one. In fact, he could not even offer a rough time estimate for the motion, saying that would depend on how long it took him to review the trial transcripts, research and investigate potential issues, and put everything together.

Citing the victims' need for closure, the prosecution opposed Nayeri's request for self-representation on that basis it had already been over a year since the jury had returned its verdict. The trial court agreed the motion was untimely. It refused to allow Nayeri to represent himself for fear it would lead to further delay and disruption of the proceedings. The court did grant Nayeri leave to personally supplement his attorney's new trial motion, but he elected not to do so.

2. Analysis

As our Supreme Court explained in *Doolin, supra*, "A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including [post-conviction proceedings]. [Citations.] The right to counsel may be waived by a criminal defendant who elects to

represent himself . . . . [Citation.] The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and [timely presented]. Otherwise, requests for self-representation are addressed to the trial court's sound discretion. [Citation.] (*Doolin, supra,* 45 Cal.4th at p. 453.)

"The timeliness requirement 'serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice.' [Citation.]" (*Doolin, supra,* 45 Cal.4th at p. 454.) Thus, if the circumstances indicate the defendant's request for self-representation is untimely and would disrupt or delay the proceedings, the trial court has every right to deny it. (*Ibid.*)

In *Doolin*, the defendant sought to represent himself in postconviction proceedings immediately after the trial court denied his request for a new attorney. In upholding the denial of that request, the Supreme Court stated, "Defendant's request was manifestly untimely. He never requested self-representation during the guilt or penalty phase. He appeared on the day set for sentencing and sought, not to act as his own counsel, but to replace his appointed lawyer with a new one and to secure a continuance. Only when this approach failed did defendant seek self-representation, and . . . [w]hen pressed on the question of [why he wanted to act as his own attorney], defendant answered vaguely that 'there are still things that need to be done that could be presented to the Court.' Defendant provided no specific information about any new evidence he expected to find, when he expected to find it, or how long he might need to prepare his motions. He was not prepared to proceed and could not provide a reasonable estimate of when he would be ready. The trial court's ruling was well within the scope of its discretion." (*Doolin, supra,* 45 Cal.4th at pp. 454–455.)

Like the defendant in *Doolin*, Nayeri never sought to represent himself during the trial or at any time before his request for a substitution of counsel was denied. And while Nayeri expressed displeasure with his attorney's new trial motion, he could not provide any specifics as to how he intended to proceed with the motion, saying only that "further investigation" was required. As in *Doolin*, Nayeri was also unable to offer any estimation as to how long it would take him to investigate and prepare his own motion. These circumstances strongly support the trial court's decision to deny Nayeri's request for self-representation as untimely and disruptive to the orderly administration of justice.

Nayeri cites two countervailing considerations. First, the court complimented the handwritten letters he had submitted in support of his request for a new attorney, which suggests he was competent to act as his own attorney. Second, the parties agreed to a three-week continuance for the hearing on the new trial motion, so a delay was required regardless of whom was handling the motion. However, the problem was, Nayeri could not offer any assurances that the motion would not have to be continued well beyond that time if he were representing himself. And by then, it had already been over a year since he had been convicted. Under these circumstances, the trial court was justifiably concerned that an unspecified delay in the proceedings would unnecessarily disrupt the orderly and timely administration of justice. (See *People v. Windham* (1977) 19 Cal.3d 121, 128 [in considering a motion for self-representation, the trial court may consider "the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion"].)

Although not dispositive, it is also worth noting that the trial court gave Nayeri permission to file a letter brief to supplement defense

counsel's new trial motion. That way, Nayeri could raise any arguments he felt were missing or underdeveloped in the motion. However, Nayeri did not avail himself of that opportunity, which casts doubt on the sincerity of his request to act as his own attorney. Considering all the attendant facts and circumstances, the trial court did not abuse its discretion in denying that request.

*H.  New Trial Motion*

We now turn to the merits of the new trial motion. Nayeri contends the motion should have been granted based on newly discovered evidence related to the third-party culpability theory that his attorney floated in his opening statement to the jury. However, we find no abuse of discretion in the trial court's decision to deny the motion.

1.  Factual Background

As we explained above in connection with Nayeri's prosecutorial misconduct arguments, defense counsel told the jury during his opening statement that Nawal Figueroa was prepared to testify that she befriended Kevorkian's ex-wife Marisol Garcia while they were in prison together. Defense counsel expected Figueroa to testify that Garcia told her she had recruited some Mexican gang members to carry out the kidnapping with Kevorkian. However, Figueroa ended up defying her subpoena, and the defense was unable to secure her testimony at trial.

In support of its new trial motion, the defense presented a declaration from investigator Gleim saying he interviewed Figueroa on August 11, 2020, roughly one year after Nayeri was convicted. Gleim declared that he was unable to reach Figueroa before then because "she disappeared during the trial" and he did not have her contact information. Furthermore, although Figueroa allegedly stood by her claim as to what Garcia had told

84

her in prison regarding the kidnapping, Figueroa was unwilling to submit an affidavit or testify due to safety concerns for herself and her cousin.

Following his interview with Figueroa in August 2020, Gleim tried to contact her numerous times to obtain a declaration or arrange for her to testify in court, but he was unsuccessful in that regard. After hearing argument on the issue, the trial court determined this offering was insufficient to justify a new trial and denied Nayeri's motion.

2. Analysis

Pursuant to section 1181, the trial court may grant a motion for a new trial when new and material evidence is discovered by the defendant which he could not with reasonable diligence have discovered and presented during the trial. (§ 1181, subd. (8).) "The central question in the determination of whether a new trial should be granted on the ground of 'newly discovered evidence' is whether that evidence would probably result in a different verdict upon retrial. [Citation.] That is a question which normally can best be answered by the trial judge, who has been witness to the presentation of all the evidence at trial. Consequently, the trial court's determination that a new trial should not be granted may be disturbed only where it is shown that there had been an abuse of discretion—as, for example, where the 'newly discovered evidence' contradicts the strongest evidence introduced against the defendant." (*People v. Cooper* (1979) 95 Cal.App.3d 844, 852.)

It is also well established that "[w]hen a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given[.]" (§ 1181, subd. (8).) In this case, however, Nayeri simply presented a declaration from his own

investigator. Because he failed to present a declaration from Figueroa—the witness from whom the newly discovered evidence was expected to be given—his motion was procedurally deficient. (*People v. Beeler* (1995) 9 Cal.4th 953, 1005, abrogated on other grounds in *People v. Edwards* (2013) 57 Cal.4th 658, 704–705; *People v. Miramontes* (1957) 153 Cal.App.2d 402, 403; *People v. Merrill* (1951) 104 Cal.App.2d 257, 268.)

Moreover, the fact defense counsel referenced Figueroa's proposed testimony in his opening statement is proof her testimony was not "new" for purposes of establishing grounds for a new trial. (§ 1181, subd. (8).)[14] Nor was her expected testimony material in the sense that it would have rendered a different result probable on retrial. (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) Figueroa's story about what Garcia allegedly told her in prison had inherent credibility problems, due to their status as convicted felons. And beyond that, the story itself—that the kidnapping was carried out by Mexican gang members, i.e., persons of Hispanic descent—was severely undermined by the evidence adduced at trial.

To be sure, there was some evidence the kidnappers may have been Hispanic. In speaking with the police about the men she observed near Michael's house on the afternoon of the kidnapping, Teresa T. described two of them as being Hispanic. However, at trial, Teresa testified she did not get a very good look at the men, and she was not very good at discerning people's

---

[14] In arguing otherwise, Nayeri relies on *People v. Ebaniz* (2009) 174 Cal.App.4th 743. However, in denying review in that case, the Supreme Court ordered that opinion not to be published. (See *People v. Ebaniz* (2009) 175 Cal.App.4th 142.) Therefore, it has no precedential value. (Cal. Rules of Court, rules 8.1105(e)(2), 8.1115; *Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 109–110 ["depublication nullifies the opinion as precedent and it is as if the opinion had not been written"].)

ethnicity. In bringing up these points, Teresa signaled she did not have a lot of confidence in her prior statement to the police about the men being Hispanic.

Other evidence bearing on the ethnicity of the kidnappers included Michael's statement to investigators that his captors were listening to a Spanish-speaking radio station while they were torturing him in the van on the way out to the desert. Also, at trial, Michael and Mary both testified that the kidnappers used some Spanish words and talked with a Spanish accent at times. However, Mary, who was raised with a Spanish-speaking grandmother and speaks some Spanish herself, was convinced the kidnappers' accents were contrived. In fact, she testified their accents were so bad that they reminded her of Speedy Gonzales, the cartoon character known for his exaggerated Mexican accent. This testimony contradicted a key premise of Nayeri's Mexican gang member theory, that being, the kidnapping was carried out by people of Hispanic descent.

The Mexican gang member theory was also significantly hampered by the nature of Figueroa's proposed testimony. While she alleged that Garcia had told her that Mexican gang members helped Kevorkian and Handley carry out a kidnapping, she did not say anything—one way or the other—as to whether Nayeri was involved in the crime. Her inability to expressly exculpate Nayeri left the door open for the jury to conclude that even if Mexican gang members were part of the kidnapping scheme, Nayeri was too.

For all these reasons, it is exceedingly unlikely Nayeri would have obtained a more favorable result at trial if Figueroa been available to testify about what Garcia allegedly told her in prison. Therefore, aside from its procedural flaws, Nayeri's motion was substantively insufficient to

warrant a new trial. As such, the trial did not abuse its discretion in denying the motion.

### III.

### SENTENCING

*A.  Aggravated Kidnapping Counts*

Nayeri contends he did not receive sufficient notice that he could be sentenced to life without parole (LWOP) on the aggravated kidnapping counts. Although the information did not expressly allege the specific factual circumstances giving rise to that potential sentence, we believe Nayeri was given adequate notice of the punishment he received.

1.  Factual Background

Nayeri was charged with two counts of aggravated kidnapping in violation of section 209(a). That provision mandates an LWOP sentence if the victim "suffers death or bodily harm, or is intentionally confined in a manner that exposes that person to a substantial likelihood of death[.]" (§ 209(a).) Otherwise, the proscribed punishment is life with the possibility of parole. (*Ibid*.)

Although section 209(a) contains two different punishment options, the statute actually defines but one crime, aggravated kidnapping. Whether the victim dies, suffers bodily harm or is subjected to a substantial likelihood of death are special factors pertaining to the issue of punishment, but they do not affect the singular nature of the underlying offense. (*People v. Britton* (1936) 6 Cal.2d 1, 4-5 (*Britton*).)

In this case, the complaint and information alleged Nayeri committed aggravated kidnapping in violation of section 209(a) by kidnapping Michael (count 1) and Mary (count 2) for ransom, reward,

extortion and to exact money from another person. The prosecution did not allege any special sentencing factors related to the issue of punishment.

However, during the conference on jury instructions, the court discussed CALCRIM No. 1202, the standard instruction on aggravated kidnapping. In addition to setting forth the elements of that offense, the instruction contains a paragraph entitled, "Sentencing Factor," which states: "If you find the defendant guilty of [aggravated kidnapping], you must then decide whether the People have proved the additional allegation that [the victim died/suffered bodily harm or was confined in a way that created a substantial likelihood of death]." (CALCRIM No. 1202.) Although the trial court alluded to the sentencing factors in CALCRIM No. 1202, indicating they were apt in this case, defense counsel did not object to the instruction. Nor did he request instructions on any lesser included offenses. Because his sole defense was misidentification, he did not see the need for any such instructions.

Alas, the jurors were instructed per CALCRIM No. 1202 that if they found Nayeri guilty of aggravated kidnapping as alleged in count 1, they must decide whether the prosecution proved the additional allegation that Michael suffered bodily harm. And, if they found Nayeri guilty of aggravated kidnapping in count 2, they must decide whether the prosecution proved the additional allegation that Mary was confined in a manner that subjected her to a substantial likelihood of death.

During closing arguments, the prosecutor argued there was ample evidence to support those allegations, and defense counsel did not express any disagreement with that claim. Defense counsel instead took the position that Nayeri had nothing to do with the kidnapping plan that led to

89

Michael suffering bodily harm and Mary being exposed to a substantial likelihood of death.

The jury rejected defense counsel's argument. It not only found Nayeri guilty of aggravated kidnapping, as alleged in counts 1 and 2, it also found true the special allegations of bodily harm as to Michael and substantial likelihood of death as to Mary. The question we must decide is whether this verdict, and Nayeri's subsequent sentence for LWOP on those counts, violates due process because Nayeri was never formally charged with those special allegations.

2. Analysis

Due process is an integral component of our criminal justice system. Among other things, it requires that an accused be afforded "'fair notice of the charges against him in order that he may have a reasonable opportunity properly to prepare a defense and avoid unfair surprise at trial.' [Citation.]" (*People v. Toro* (1989) 47 Cal.3d 966, 973, disapproved on other grounds in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.; see also *People v. Anderson* (2020) 9 Cal.5th 946, 964 (*Anderson*) [proper notice allows the defendant "to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial"].) This requirement extends to both substantive offenses and sentence enhancements alike. (*Anderson, supra*, 9 Cal.5th at p. 953.) However, as the Supreme Court's early decision in *Britton, supra,* makes clear, due process was not violated by the charging procedure utilized in this case.

As here, the defendant in *Britton* argued his LWOP sentence for aggravated kidnapping under section 209 was unlawful because, although the evidence amply proved as much, the accusatory pleading did not formally

allege the victim suffered bodily harm; instead, it simply alleged the requisite elements of aggravated kidnapping. However, the *Britton* court found nothing wrong with this charging method. It ruled, "A charge in the language of [section 209] that the accused had kidnapped his victim [for one of the reasons proscribed in the statute] apprises the accused of what he will be expected to meet and of the several punishments prescribed therefor, any one of which, upon conviction, may be imposed upon him." (*Britton, supra*, 6 Cal.2d at p. 5.) Therefore, it was immaterial that the accusatory pleading failed to allege the particular sentencing factor that was used to increase the defendant's punishment from life in prison to LWOP. (*Ibid*.)

In rejecting the defendant's lack-of-notice argument in *Britton*, the Supreme Court stated, "It is well settled in this state that an indictment or information need not allege the particular mode or means employed in the commission of an offense, except when of the essence thereof. [Citation.] In other words, particulars as to manner, means, place or circumstances need not in general be added to the statutory definition. [Citations.] The indictment or information need only charge the essential elements of the statutory offense. It then fairly apprises the defendant of what he is to meet at the trial." (*Britton, supra*, 6 Cal.2d at p. 5.)

To his credit, Nayeri acknowledges *Britton* undermines his due process argument. Nonetheless, he contends it "appears" that *Britton* was impliedly overruled by the Supreme Court's more recent decision in *Anderson, supra*. We cannot agree.

In *Anderson*, the defendant was charged with first degree murder and multiple counts of second degree robbery. In connection with the murder charge, the information alleged a sentence enhancement that Anderson was vicariously liable for a codefendant's injurious discharge of a firearm.

91

(§ 12022.53, subds. (d), (e).) That enhancement, which we will refer to as the vicarious discharge enhancement, carried a mandatory sentence of 25 years to life. (*Ibid.*) In contrast, the robbery counts contained less serious allegations that Anderson personally used a firearm. (§§ 12022.53, subd. (b), 12022.5, subd. (a).)

However, even though the vicarious discharge enhancement was not alleged as to the robbery counts, the jury instructions and verdict forms permitted the jury to return findings that would support the enhancement with respect to each of those counts. And, ultimately, that is what it did. Based on the jury's true findings on the uncharged vicarious discharge allegations, Anderson's sentence was enhanced 125 years above and beyond what the original charges would have otherwise permitted. (*Anderson, supra*, 9 Cal.5th at pp. 950–952.)

In finding the accusatory pleading failed to provide Anderson with adequate notice of that possibility, the Supreme Court stated, "Fair notice requires that every sentence enhancement be pleaded in connection with every count as to which it is imposed. [Citation.]" (*Anderson, supra*, 9 Cal.5th at pp. 956-957.) Thus, it did not matter that the vicarious discharge enhancement was alleged as to the murder count. Because that enhancement was not alleged with respect to the robbery counts, Anderson had no way of knowing he faced five additional 25-year-to-life enhancements on those counts. (*Ibid.*) In fact, because the vicarious discharge enhancement was alleged only on the murder count, Anderson was "entitled to assume the prosecution made a discretionary choice not to pursue the enhancement on the [robbery counts], and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial. [Citation.]" (*Id.* at p. 956.)

This reasoning clearly does not apply to the present case. The fundamental reason Anderson was blindsided by the vicarious discharge enhancements is that they had no inherent relationship to the underlying crime of robbery. Standing alone, that offense does not contemplate increased punishment for vicarious discharge of a firearm. (§ 211.) Therefore, from a charging perspective, the only way Anderson could have known he was looking at additional prison time on his robbery counts for vicariously discharging a firearm was if the prosecution alleged a separate and distinct sentencing enhancement with respect to those counts. (See also *In re Vaquera* (2024) 15 Cal.5th 706 [due process violated where defendant was punished for an unalleged enhancement that was not encompassed in his underlying offense]; *People v. Mancebo* (2002) 27 Cal.4th 735 [same]; *People v. Perez* (2015) 240 Cal.App.4th 1218 [same].)

Here, in contrast, the underlying crime of aggravated kidnapping and the relevant enhancement factors are not set apart from each other in different provisions of the Penal Code. Rather, they are embedded in a single statutory provision, section 209(a). That provision plainly states that if the victim of an aggravated kidnapping dies, suffers bodily harm, or is exposed to a substantial likelihood of death, the defendant's mandatory sentence is LWOP. (§ 209(a).) As our Supreme Court explained in *Britton,* this close relationship between crime and punishment obviates the need to charge the sentencing factors in the accusatory pleading when a violation of section 209 is alleged.

Therefore, irrespective of *Anderson*'s holding on different facts and charges, *Britton* is still good law and binding in this case. Pursuant to that decision, the fact Nayeri was charged with the essential elements of aggravated kidnapping under section 209(a) provided him with sufficient

93

notice he could be sentenced to LWOP if the evidence established his victims suffered bodily harm or were subjected to a substantial likelihood of death. (*Britton, supra*, 6 Cal.2d at p. 5; accord, *People v. Reeves* (1955) 135 Cal.App.2d 449, 453–454; *People v. Holt* (1949) 93 Cal.App.2d 473, 476; *People v. Haley* (1941) 46 Cal.App.2d 618; but see *People v. Soto* (1977) 74 Cal.App.3d 267, 271, fn. 2 [declining to follow *Britton* in an aggravated kidnapping case where the prosecutor had affirmatively represented that he was not going to prosecute the defendant for inflicting bodily harm on the victim].)

Even if *Britton* is not controlling, the timing of how Nayeri's case played out support the conclusion he had notice of a possible LWOP sentence. On March 18, 2015, he and Handley were jointly charged in a consolidated information with aggravated kidnapping in violation of section 209(a). The information did not allege the special factors governing the punishment for that offense. Nevertheless, following Handley's separate trial in 2017, he was sentenced to LWOP based on the jury's finding that Michael suffered bodily harm and Mary was subjected to a substantial likelihood of death during the kidnapping. That sentence came down on July 20, 2018, which was nearly a full year before Nayeri's trial got under way. Thus, Nayeri had plenty of time to construct his case strategy with Handley's fate in mind. Knowing that Handley had been sentenced to LWOP for the same charges he faced, Nayeri cannot plausibly maintain he lacked notice that he too could receive such a sentence. For that reason, as well, we find Nayeri's due process claim unavailing.[15]

---

[15] Given this conclusion, we need not consider respondent's claims that Nayeri forfeited his due process argument by failing to raise it in the trial court, or that the charges were informally amended by virtue of the

*B. Section 654*

Nayeri also faults the trial court for sentencing him for both kidnapping and torturing Michael. He claims those two crimes were part of the same course of conduct and done for the same reason, i.e., to get money from Michael, and therefore dual punishment was prohibited under section 654. The claim is not well taken.

Pursuant to section 654, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) The statute "applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.]" (*People v. Perez* (1979) 23 Cal.3d 545, 551; accord, *People v. Corpening* (2016) 2 Cal.5th 307, 311; *In re Calvin S.* (2016) 5 Cal.App.5th 522, 533.)

Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the defendant. If all of his crimes were carried out pursuant to a single objective, multiple punishment is prohibited. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) However, if the defendant "entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible

---

preliminary hearing evidence, the trial court's instructions, and the prosecutor's closing argument.

course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639; accord, *People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

The crimes in this case involved a course of conduct that started with the victims being kidnapped from their home in Newport Beach and ended two and a half hours later when they were left out in the Mojave Desert. During that period of time, the kidnappers tortured Michael repeatedly, and once they realized they were not going to get the million dollars they were after, they cut off his penis and doused him with bleach. Nayeri contends section 654 applies to preclude punishment on the torture count because the only reason he and his cohorts tortured Michael was to get him to tell them where the million dollars was, which is why they kidnapped him in the first place.

At sentencing, the trial judge rejected this contention on the basis the kidnappers did not only torture Michael on the way out to the desert, when they were focusing on the million dollars, they also tortured him in the desert, after they had given up all hope of getting the money. Indeed, some of the torture occurred after the kidnappers cut off Michael's penis, when they poured bleach over his body. This act clearly added to Michael's suffering, yet it had nothing to do with the kidnapper's quest for money, which was obviously a lost cause by that time. Therefore, the court properly determined that section 654 did not apply to the torture count. (See *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657 [upholding multiple punishment for both the crime of kidnapping and a separate offense that added to the victim's suffering].)

## IV.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Nayeri claims his trial attorney was ineffective for not securing Figueroa's testimony at trial to support the Mexican gang member theory he talked about in his opening statement. However, "[m]aking promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885; see, e.g., *People v. Stanley* (2006) 39 Cal.4th 913, 955 [failing to deliver promised testimony on the issue of identification did not render defense counsel's performance prejudicially deficient].) And we see no reason to conclude Nayeri's attorney was ineffective for failing to deliver on his promise in this case.

As we explained above, even if Figueroa had testified as to what Garcia allegedly told her in prison, it is not reasonably probable that Nayeri would have obtained a more favorable result at trial. That is because Figueroa and Garcia are both convicted felons, and Garcia's story about how she allegedly recruited Mexican gang members to carry out the kidnapping was severely undermined by Mary's testimony that the kidnappers spoke in a fake, cartoonish Spanish accent. Mary's testimony not only refuted the suggestion the kidnappers were Hispanic, it also permitted the jury to infer that Nayeri and his cohorts took evasive steps to conceal their identity, which is circumstantial evidence of their guilt.

Considering as well that Garcia's story did not directly exculpate Nayeri with regard to the charged offenses, we do not believe Nayeri was prejudiced by its absence. Therefore, defense counsel was not ineffective for failing to produce the story through Figueroa. (See *People v. Hester* (2000) 22 Cal.4th 290, 296-297 [the lack of prejudice from counsel's alleged failings

will defeat a claim of ineffective assistance of counsel irrespective of whether counsel's performance was actually deficient].)

Alternatively, Nayeri contends defense counsel was ineffective for failing to take steps to ensure the jury understood the absence of Figueroa's testimony was attributable to her own unwillingness to appear for trial, rather than any sort of problem with what she intended to say on the witness stand. Nayeri contends this measure was needed to prevent the jury from inferring Figueroa was not called as a witness because of defense counsel's dereliction or because her testimony would not have assisted the defense.

However, during his closing argument, defense counsel came clean on this issue and apologized for the fact that some of the things he mentioned in his opening statement did not come out during the trial. The prosecutor also talked about this issue in his rebuttal argument. Although he briefly commented on the lack of evidence to support the Mexican gang member theory, the prosecutor did not fault defense counsel for that evidentiary void or imply that Figueroa would not have been a helpful witness for the defense. Rather, he told the jury that defense counsel was "a phenomenal lawyer" and that he did not have to apologize for anything because "trials are fluid" and "he didn't do anything wrong."

Thus, the jury was unlikely to draw an adverse inference against the defense for failing to produce Figueroa as a witness at trial. It is not reasonably likely that Nayeri would have achieved a more favorable verdict had Figueroa actually testified or had defense counsel handled her absence from trial any differently than he did. That being the case, we find no violation of Nayeri's right to effective assistance of counsel. (See *In re Fields* (1990) 51 Cal.3d 1063, 1079 [irrespective of the wisdom of counsel's chosen

trial tactics, the lack of any resulting prejudice will doom a claim of ineffective assistance of counsel].)

## V.

### CUMULATIVE ERROR

In his final argument, Nayeri contends the alleged errors at this trial overlapped and compounded each other in a manner that undermined his constitutional right to due process. Therefore, even if the errors do not individually warrant reversal, he should be afforded a new trial on the basis of cumulative error. We acknowledge "'a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Sorden* (2021) 65 Cal.App.5th 582, 618.) But we do not believe those circumstances exist in this case.

"Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) For cumulative error to mandate reversal, it must be shown to have violated the defendant's fundamental right to a fair trial. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.)

Nayeri's trial was not perfect, but it was fair. Having carefully studied Nayeri's multitudinous arguments and the voluminous record of his trial, we have full confidence the jury's verdict was based on the law and the facts, as opposed to other improper considerations. We do not believe the few errors that did occur—whether considered individually or in conjunction with each other—rendered Nayeri's trial unfair. Alas, there is no basis to disturb the judgment against him.

## DISPOSITION

The judgment is affirmed.


                                     O'LEARY, P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.